CIMARRON TRUST ESTATE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6555–70. Filed October 31, 1972.

*Earnest L. Langley*, for the petitioner.
*Kenneth A. Little*, for the respondent.

SIMPSON, *Judge:* The respondent determined deficiencies in the Federal income tax of the petitioner of $38,971.98 for the year ended

May 31, 1967, and of $9,600.64 for the year ended May 31, 1968. The only issues to be decided are (1) whether a debt owed to the petitioner was totally worthless on December 31, 1964, when it was canceled, and (2) whether a taxpayer using the unit-livestock-price method for valuing inventory must include unweaned calves.

FINDINGS OF FACT

Some of the facts were stipulated, and those facts are so found.

The petitioner, Cimarron Trust Estate (Cimarron), is an Oklahoma business trust having its legal residence in Kenton, Okla., at the time of the filing of its petition in this case. For the taxable years ended May 31, 1967, and May 31, 1968, its Federal income tax returns were filed with the district director of internal revenue, Dallas, Tex. The petitioner is regarded as a corporation for Federal income tax purposes.

From 1957 until his death on February 20, 1964, Mr. W. B. Renfro, in community with his wife, owned all of the petitioner's certificates of beneficial interest. The petitioner is primarily engaged in the ranching business, and according to the terms of the instrument establishing the petitioner, trustees were to manage and hold the petitioner's properties for the benefit of the certificate holders.

Between 1957 and his death, Mr. Renfro borrowed $428,898.66 on open account from the petitioner. He repaid $256,549.75 of this amount before his death, and on December 31, 1964, the trustees of the petitioner forgave the remainder of the debt. The minutes of the trustees' meeting state that the debt was canceled because such action was in "the best interest of * * * [Mr. Renfro's] estate, under all the circumstances existing including the condition of the Estate."

Mr. Renfro died intestate, and Dorothy L. Renfro, his surviving spouse, was his sole heir and the administratrix of his estate. On May 7, 1964, she filed a report with the probate court in regard to such estate which listed the assets and liabilities of the community estate of herself and Mr. Renfro. The report listed assets amounting to $5,321,833.32, and indicated that Mr. Renfro had no assets in addition to those which he held in community with his wife. Among the assets listed were the TO Ranch in New Mexico, valued at $2,870,000, and the certificates of interest in the petitioner, valued at $750,000. The listed liabilities amounted to $4,471,326.96, of which approximately $2,885,000 plus interest was attributable to mortgages on the TO Ranch. The debt owed to the petitioner when Mr. Renfro died was also listed as a liability of the community estate. The listed liabilities, however, did not include a $176,020.83 claim by Alex Shuford which had been filed against Mr. Renfro in the U.S. District Court and which was eventually settled for $35,000 in 1965.

During 1964, drought conditions existed on both the Cimarron ranching property and the TO Ranch, and in view of the costs of feeding the cattle and the interest payments that became due on the indebtedness of the estate, Mrs. Renfro and her advisers decided not to operate the ranches. Shortly after Mr. Renfro's death, they began an extensive effort to sell the TO Ranch and the ranching property of the petitioner. They believed that both assets would have to be sold, if the estate was to pay all of its debts as they became due. Of particular concern was making the November 1, 1964, and the December 31, 1964, payments on the TO Ranch mortgages. These payments amounted to over $450,-000, and each of the first two mortgages contained a clause providing that, in the case of default by the debtor, the amount of outstanding indebtedness on that mortgage would become payable.

By October 1964, the cattle on the TO Ranch had either been sold or arrangements made for their sale. During that same month, Mrs. Renfro and Mr. Sears, a bank president, represented to the probate court that the TO Ranch could be sold by the end of the year for more than the indebtedness against it. On November 1, 1964, a payment on the TO Ranch second mortgage became due, and it was paid with the proceeds of a $100,000 loan from a financial institution. A provision of that mortgage called for the acceleration of the entire amount of indebtedness outstanding on that mortgage if less than 2,000 head of cattle were kept on the TO Ranch, but this provision was never enforced.

In December 1964, the attorney for the estate contacted Mr. James H. Bradley concerning the purchase of Cimarron. Mr. Bradley had told an employee of Mrs. Renfro in June or July 1964 that he would be interested in purchasing the ranching property of the petitioner for $600,000. He was still interested in purchasing the ranchlands, but he had no interest in purchasing the debt owed to Cimarron by the estate of Mr. Renfro. On December 23, 1964, Mrs. Renfro contracted to sell all the beneficial interest in the petitioner to Mr. Bradley for $600,000. Of this amount, $237,291.20 was to be paid directly to the mortgagee of the lands owned by the petitioner, and $12,905.85 was to be paid to the State of Oklahoma as the yearly rent on the lands which the petitioner leased. The contract also provided that the petitioner would divest itself of all of its assets except the lands it owned and leased. The contract further provided that the beneficial interest in the petitioner would be transferred along with control of the board of trustees when the contract was consummated. The contract was consummated on March 24, 1965.

During December 1964, efforts were also made to sell the TO Ranch, but they were unsuccessful. In late December, an extension to January 6, 1965, was granted for the payment of the amount due on the

TO Ranch first mortgage. As of December 31, 1964, there were no negotiations in progress for the sale of the ranch and no known prospective buyers. On that date, Mrs. Renfro was still president and a trustee of the petitioner, and the trustees voted to cancel the debt owed to the petitioner by the estate. No attempt to collect or assign the debt had been made, and the estate had not attempted to borrow money to pay the debt.

On January 2, 1965, T. L. Roach first became known as a prospective purchaser of the TO Ranch, and on January 4, 1965, he purchased the ranch. After the payment of the debts which were not assumed by Mr. Roach, approximately $80,000 was realized on the sale.

The Federal estate tax return for the estate of W. B. Renfro reflected a net community estate of W. B. and Dorothy Lee Renfro of over $698,000, and a net worth of $349,095.35 for the individual estate of W. B. Renfro.

On its Federal income tax return for the year ended November 30, 1965, the petitioner claimed a bad debt deduction of $172,348.91 arising out of the cancellation of the debt of the estate. Such deduction caused the petitioner to show a net operating loss on such return, and such net operating loss resulted in a carryover to the taxable years 1967 and 1968. The respondent determined that the debt was not totally worthless when it was canceled and denied the deduction and the resulting carryover.

The petitioner has adopted the unit-livestock-price method for valuing its inventory of cattle, using the following unit values:

| | |
|---|---|
| Calves | $50.00 |
| Yearling heifers | 85.00 |
| Yearling steers | 87.50 |
| 2-year heifers | 150.00 |
| 2-year steers | 175.00 |

At the close of its taxable year, most of the petitioner's calves were not more than 2 or 3 months old, and as a matter of consistent practice, the petitioner has never inventoried unweaned calves for tax purposes.

In April 1966, a bank inspection report listed an inventory of 345 unweaned calves, and an inventory prepared by the petitioner's accountant for May 31, 1967, listed an inventory of 872 unweaned calves.

The respondent determined that unweaned calves were includable in the petitioner's inventory for tax purposes, and he included 400 such calves in inventory as of May 31, 1966, 872 as of May 31, 1967, and 1,037 as of May 31, 1968.

OPINION

The only issues to be decided are whether the debt owed to the petitioner by the estate of Mr. Renfro was totally worthless when it was canceled, and whether the petitioner must include unweaned calves

in its inventory. The petitioner has conceded that there is no issue of partial worthlessness involved in this case.

The petitioner has the burden of proving total worthlessness of a debt with respect to which a deduction is claimed. Rule 32, Tax Court Rules of Practice; see *Publishers New Press, Inc.*, 42 T.C. 396 (1964). The petitioner has not met its burden in this case.

The parties agree that the cancellation of a debt does not establish its worthlessness. See *Liggett's Estate v. Commissioner*, 216 F. 2d 548 (C.A. 10, 1954), affirming a Memorandum Opinion of this Court; 5 Mertens, Law of Federal Income Taxation, sec. 30.36 (1969). Rather, whether a debt is worthless is a factual question which must be determined on the basis of "reasonableness, common sense and economic reality." *Scovill Manufacturing Co. v. Fitzpatrick*, 215 F. 2d 567, 570 (C.A. 2, 1954). In examining the reasonableness of the deduction, the courts have long given weight to the exercise of the taxpayer's business judgment. *Portland Manufacturing Co.*, 56 T.C. 58, 73 (1971). However, such exercise must be closely scrutinized where the debtor and the creditor are related parties. See *Giffin Andrew*, 54 T.C. 239, 245 (1970).

In the present case, the need for careful scrutiny is especially great. At the time of the cancellation, the contract of sale had not been consummated, and the debtor, the estate of Mr. Renfro, and Mrs. Renfro were still the owners of the beneficial interest of the petitioner. Furthermore, the attorney for the estate testified that steps were not taken to collect the debt because it would cause other creditors to react and jeopardize the whole estate. He also testified that the trustees could not force Mrs. Renfro to do anything that she did not wish to do. Indeed, the instrument establishing the petitioner required the trustees to act in the best interest of the holders of the certificates of beneficial interest, and the resolution canceling the debt did not declare it worthless but stated that the debt was canceled because it was in the best interests of the estate. For these reasons, it is clear that the trustees' action cannot be viewed as indicating that the debt was worthless on December 31, 1964.

The very statement of the petitioner's argument supports this view and reveals that the debt was not canceled because it was worthless. The petitioner argues that the estate of Mr. Renfro, as of the end of 1964, was faced with the necessity of making a substantial payment on the mortgages on the TO Ranch or selling it, that it lacked the funds to make such payment and could not find a purchaser, that it desperately needed to sell its beneficial interest in the petitioner, and that to make such sale, the debt had to be canceled. Yet, Mrs. Renfro was the administratrix of the estate and the sole beneficiary. As such, she sought to protect her interest in the TO Ranch. She wished to sell the

certificates of beneficial interest in the petitioner, and the evidence indicates that she used her influence over the petitioner to have the debt canceled so that the sale could be accomplished. Such circumstances may illustrate the financial difficulties experienced by the estate, but they utterly fail to demonstrate that the debt was worthless.

The petitioner contends, however, that on December 31, 1964, the estate of Mr. Renfro was insolvent and that the trustees simply canceled a worthless debt. In making such argument, the term "insolvency" was apparently used to mean an excess of liabilities over assets. See 5 Mertens, *supra* at sec. 30.57. It is not at all clear that the estate was in fact insolvent on December 31, 1964, but even if it were, such insolvency would not show the debt was totally worthless, *W. D. Roussel*, 37 T.C. 235, 245 (1961); *Trinco Industries, Inc.*, 22 T.C. 959, 965 (1954). An excess of liabilities would show no more than that the accounts of the estate were probably uncollectible in *part*. See *Trinco Industries, Inc.*, *supra* at 965; *Higginbotham-Bailey-Logan Co.*, 8 B.T.A. 566 (1927). It is clear that the estate had some assets. A contract to sell the entire beneficial interest in the petitioner had been executed, and the May report filed with the probate court had listed community assets in addition to the certificates of interest in the petitioner and the TO Ranch of approximately $1,700,000—one-half of which belonged to the estate. Thus, even if the TO Ranch mortgages had been foreclosed and the ranch sold for less than the indebtedness outstanding against it, there would have been assets remaining out of which to pay at least a part of the unsecured debts of the estate. See *W. D. Roussel*, *supra*. Furthermore, the petitioner has not even suggested that it would not have been treated on a par with other general unsecured creditors of the estate, if a distribution for the benefit of creditors had occurred, and we hold that the debt was not totally worthless on December 31, 1964.

The second issue to be decided concerns the includability of unweaned calves in the inventory of a taxpayer who uses the unit-livestock-price method of inventory. The petitioner contends that unweaned calves are not marketable and should not be includable in inventory. Section 1.471–6 of the Income Tax Regulations deals with the use of inventories by farmers in the computation of income. Paragraph (c) provides that because of the difficulty of computing the costs of products, a farmer may elect to use the unit-livestock-price method for valuing an inventory of livestock. Under such method, paragraph (e) requires a farmer to establish classes of livestock includable in his inventory and to fix a unit price for each class that represents the normal costs of producing such an animal. Paragraph (f) provides that "A taxpayer who elects to use the 'unit-livestock-price method' must apply it to *all* livestock raised, whether for sale or for draft, breeding, or dairy purposes." (Emphasis added.) Paragraph

(f) was upheld in *United States* v. *Catto*, 384 U.S. 102 (1966), and it was held that breeding cattle had to be included in inventory even though breeding cattle might not be the type of asset usually includable in inventory.

It is clear that the unit-livestock-price method is an alternative to the computation of the actual costs of producing livestock. It is intended to measure the costs of production, and is not intended to represent the fair market value of the units included in the inventory. In *Leo Sheep Co.* v. *Schuster*, 234 F. Supp. 761 (D. Wyo. 1964), the taxpayer, which used the unit-livestock-price method, sought to assign a lower value to its older sheep on the ground that an older animal is worth less on the market. The court rejected such contention, pointing out that the unit-livestock-price method was intended to represent cost, not value. *United States* v. *Catto, supra* at 107 fn. 8. Thus, the fact that an unweaned calf is not marketable is no basis for not including it in the inventory. Accordingly, we hold that such calves must be included in the inventory.

The petitioner does not contend that the $50-per-calf-unit figure used by the petitioner should be reduced if we hold that the unweaned calves are includable in inventory. It does contend, however, that the respondent incorrectly determined the unweaned-calf inventory. Yet, the petitioner has not shown the determination to be plainly arbitrary. See *Lucas* v. *Structural Steel Co.*, 281 U.S. 264 (1930). The inventory for May 31, 1966, was based on a bank agent's report; the inventory for May 31, 1967, was based on an inventory of the petitioner's accountant; and the inventory for May 31, 1968, was computed by multiplying the ratio of cows to calves on May 31, 1967, times the number of cows actually inventoried on May 31, 1968. There was no information available as to the actual number of unweaned calves as of May 31, 1966, or May 31, 1968. Under these circumstances, we sustain the respondent's determination.

*Decision will be entered for the respondent.*