MORRIS STUHAAN and MAXINE STUHAAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stuhaan v. Commissioner
Docket No. 6606-74.
United States Tax Court
T.C. Memo 1976-367; 1976 Tax Ct. Memo LEXIS 37; 35 T.C.M. (CCH) 1667; T.C.M. (RIA) 760367; December 2, 1976, Filed Curtis Darling and David B. Day, for the petitioners. Lawrence G. Becker, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency in the amount of $45,281 in petitioners' Federal income tax for 1970. Certain issues having been settled, the only one remaining for decision *38 is whether petitioners are entitled to a bad debt deduction under section 166(f)[1]/ or 166(d) or an expense deduction under section 212 for the repayment in 1970 of certain bank loans the proceeds of which were used in the farming operations of petitioners' son. FINDINGS OF FACT Petitioners Morris Stuhaan and Maxine Stuhaan, husband and wife, were legal residents of Tulare, California, when their petition was filed. They timely filed a joint Federal income tax return for 1970 with the Internal Revenue Service Center, Ogden, Utah. In computing their taxable income in that return, petitioners claimed a deduction in the amount of $63,053 for a "bad debt * * * pursuant to section 166(f) of the Internal Revenue Code of 1954." Petitioner Morris Stuhaan (hereinafter Morris) has operated a farm in the Tulare, California, area since 1940. His son, Richard Stuhaan (Richard), has operated a separate farm in the same area since 1961. During the periods relevant hereto, both Morris' and Richard's major crop was cotton. *39 However, Morris also conducted a large dairy operation. Essential to the dairy was a tract of 520 acres of farmland which Morris has leased since 1946 from Producers Cotton Oil Company (Producers). Prior to and during 1969, Richard had increasing difficulty in meeting the debts he incurred in the operation of his farm. In order to buy equipment, he borrowed money from the Security Pacific National Bank (Security Bank or the bank) in Tulare, where Morris did business. Due to further financial problems, Richard was unable to repay the money he borrowed. On February 11, 1969, Morris gave the bank his own notes of $1,750 and $8,000 to cover these equipment loans. Richard had been the defendant in numerous lawsuits for the collection of money he owed, and judgments had been entered against him. Richard owed Producers $43,046.85, and all of his business assets were mortgaged to secure that debt. On January 29, 1969, Morris entered into an agreement with Producers to pay or guarantee Richard's $43,046.85 debt. At that time Morris paid $6,000 and agreed to have his own credit balance with Producers of $3,123.71 applied on the debt. In addition, Morris guaranteed Richard's agreement *40 to pay Producers $6,784.63 annually for 5 years. As part of the settlement, Richard agreed to sign a ginning contract for 5 years, covering 600 bales of cotton per year, "originating from the allotment previously farmed by Richard Stuhaan." Under this arrangement Richard's assets were released from the mortgage to Producers. In late 1968 or early 1969, Richard approached the Security Bank for a loan to finance his farming operations during the coming year. The bank declined to make him a loan. In January 1969, however, Security Bank agreed to make a loan to Morris on the understanding that he, in turn, would make the funds available to Richard. Accordingly, on February 11, 1969, Morris and Maxine Stuhaan (Maxine) executed Promissory Note No. 98726, an open end note, payable on December 30, 1969, or, at Security Bank's option, on demand. The note was secured by substantially all the assets of Morris and Maxine as well as those of Richard. Effective February 12, 1969, Morris opened checking account No. XX1-251 at Security Bank in the name of Stuhaan Farms #2 in which was deposited $80,000, the initial proceeds of Note No. X8726. Richard was authorized to draw checks on this *41 account. Prior to the end of the year, additional amounts were advanced under that note and other similar notes executed by Morris. The moneys credited to the Stuhaan Farms #2 account were used by Richard in the operation of his farm. Each month Maxine would prepare a statement showing Richard's money needs for that month. Richard would then present the statement to Security Bank. If the balance in the Stuhaan Farms #2 account was not sufficient to satisfy Richard's needs, Security Bank would increase the loan under the open end note and credit the increase to the account. Richard would then write checks on the account to pay the farm's operating expenses. In this manner Morris and Maxine controlled Richard's spending. Under Note No. X8726, and other similar notes executed by Morris, Security Bank credited the following amounts to account No. XX1-251 and such amounts were used in Richard's farming operations during 1969 and 1970: Note No. 1969
Amount
98726
$108,000
98759
46,000
98829
49,197
98828
9,100
98759
9,582
98855
24,814
1970
98855
$242,500
799069
34,100
799237
29,000
Morris continued through 1974 to make similar notes, following *42 the same loan and disbursement procedures as in 1969 and 1970, to enable Richard to have money available to operate his farm. During 1969 and 1970, Richard sold his crops and made a series of principal payments to the Security Bank on notes signed by Morris in the respective total amounts of $148,786 and $194,500. In addition, during those years, he made interest payments to Security Bank and others in the respective amounts of $17,078.31 and $12,685.85. Of the payments made by Richard on the Security Bank notes, $4,377.99 in interest and $17,696 as principal were credited on Note No. 98726. Morris made payments of $2,779.08 in interest and $52,626 as principal on that note, leaving a balance due of $62,678. On December 31, 1969, Morris executed a note for $62,678 in favor of Security Bank renewing the balance due on Note No. 98726. On February 9, 1970, Richard paid $4,500 on this renewed note, and through periodic payments between January 21, 1970, and August 11, 1970, Morris paid the balance of $58,178 due on the renewed note. The deduction of $63,053 here in issue consists of $4,875 paid by Morris to satisfy the renewal of Richard's original equipment notes and $58,178 *43 paid to satisfy the renewal of Note No. 98726. On Richard's books of account, each advance of funds from Security Bank was credited to notes payable to the bank. Repayments to the bank were reflected as credits to that account. When Morris made payments to Security Bank on such notes, his payments were reflected on Richard's books in an account entitled "notes payable Morris Stuhaan." On Morris' books, the payments he made on the Security Bank notes were reflected as a debit to notes receivable. On March 9, 1971, Richard and his wife, Patricia, at Morris' request, executed a note payable to Morris and Maxine in the amount of $92,142. The principal of this note, for the most part, represented moneys which had been supplied to Richard under the open ended note procedure, described above, and included the $63,053 which Morris and Maxine deducted as a bad debt on their 1970 Federal income tax return. Richard's financial condition as of December 31 of 1968, 1969, 1970, and 1971, is reflected in the following balance sheet summaries: 1968
1969
1970
1971
Assets
$ 74,713
$ 61,995
$ 68,592
$ 74,775
Liabilities
108,051
162,309
164,676
193,776
Deficit
$ 33,338
$100,314
$ 96,084
$119,001
*44 In the notice of deficiency, respondent disallowed the bad debt deduction of $63,053 claimed by petitioners in their 1970 income tax return, stating: It is determined that the bad debt deduction of $63,053.00 claimed on your return as resulting from the payment by you, as guarantor of debts of your son, is not allowable. You have not established that a debtor-creditor relationship was intended or actually existed between you and your son and, furthermore, if a bona fide debt is found to exist it has not been established that such debt became worthless within the taxable year 1970. OPINION Petitioners' main contention is that the claimed deduction is allowable as a bad debt loss under section 166(f). Alternatively, petitioners rely upon section 166(d), which allows deductions for nonbusiness bad debts, and section 212, which refers to expenses for the production of income. As we view the evidence, the deduction is not allowable under any of those Code provisions. 1. Deduction as a Bad Debt Loss
Section 166(f), [2]/ on which petitioners place their principal reliance, provides that a payment by an individual taxpayer in discharge of all or part of his obligation *45 as "a guarantor, endorser, or indemnitor of a noncorporate obligation the proceeds of which were used in the trade or business of the borrower shall be treated as a debt becoming worthless" during the taxable year. However, this treatment is permitted only if the obligation of the borrower to whom such payment was made was worthless (without regard to such guaranty, endorsement, or indemnity) at the time of such payment. Thus, the section prescribes four requirements for a deduction: (1) The taxpayer-payor is not a corporation; *46 (2) The principal obligor is not a corporation; (3) The proceeds of the original obligation were used in the trade or business of the borrower; and (4) The principal obligation was worthless to the payee at the time of the payment, without regard to the guaranty, endorsement, or indemnity. Sec. 1.166-8(a)(1), Income Tax Regs.; Giffin Andrew,54 T.C. 239, 247-248 (1970). Although the parties do not agree as to who actually was the principal obligor on the notes to Security Bank, it is clear that neither the obligor nor the taxpayerpayor is a corporation. Requirements (1) and (2) of section 166(f) are, therefore, met. Petitioner contends that, in substance, Richard was the principal obligor to Security Bank and Morris was his guarantor. If that was the substance of the transaction, requirement (3) is also met since it is undisputed that the borrowed funds were used in Richard's farming operations. Assuming that Richard, in substance, was the principal obligor and Morris was only the guarantor on the notes to the bank, there remains an issue as to requirement (4)--whether Richard's obligation to the bank was worthless (without regard to the guaranty) at the time *47 Morris paid it. Without deciding whether, for the purposes of section 166(f), Richard was the borrower from the Security Bank and Morris the guarantor, we do not think petitioners have shown that Richard's obligation (assuming it was his) was "worthless" in 1970. On this ground, [3]/ we are compelled to sustain respondent's determination. Richard had substantial assets from which at least part, if not all, of the notes could have been satisfied. Pursuant to the January 29, 1969, agreement with Producers, Richard's assets were released from a mortgage to Producers. His assets, along with those of Morris, were *48 then mortgaged to Security Bank to secure the note in question. Richard's balance sheets for each of the years 1969, 1970, and 1971, show that he had assets with a book value ($61,995, $68,592, and $74,775, respectively) almost as much or in excess of the bad debt deduction ($63,053) petitioners claim. Since most of these assets, if not all of them, were mortgaged to the bank, their sales proceeds would have been available for application on the bank loans. There is no evidence that their proceeds would not have been sufficient to pay the debt in issue. Nor are we satisfied that Richard's balance sheets reflect either the fair market value of all his assets or his potential ability to meet his debts. He owned and operated a very substantial farming business--a going concern. In the settlement with Producers, he agreed to "sign a ginning contract for five years, covering 600 bales per year, originating from the allotment" [4]/ he had farmed. During 1969 and 1970, he grew cotton and from its sales proceeds made principal payments on the indebtedness to Security Bank in the amounts of $148,786 and $194,500, respectively. He evidently also met other obligations, such as his *49 annual payments to Producers. During 1969 and 1970, the price of cotton was abnormally low in relation to production costs. According to Morris' testimony, the cost of producing a pound of cotton in 1969 was 32 cents whereas the New York Cotton Exchange price was 24 cents. In October 1969, petitioners sold cotton for only 17 cents per pound. These low prices produced losses, but the evidence does not show that there were no reasonable prospects that Richard's farming venture eventually would prosper. [5]/ In fact, Morris testified that "things started getting a little better about '71 in agriculture" and that Richard then "began to get on his feet again." Morris continued to arrange for Richard to receive financing from Security Bank through 1974, thus reflecting his judgment that Richard had the potential earning capacity to recover financially and pay his debts. *50 Petitioners misconceive their burden of proof in arguing that the deficit balances in Richard's balance sheets establish that Richard's obligations were worthless in 1970. Proof of insolvency, i.e., that a debtor's liabilities exceed his assets, does not establish a debt's worthlessness. Cimarron Trust Estate,59 T.C. 195, 200 (1972); W. D. Roussel,37 T.C. 235, 245 (1961); TrincoIndustries, Inc.,22 T.C. 959, 965 (1954). Such proof would show no more than that the debtor's accounts were uncollectible in part. The debt to Security Bank, in dispute in the instant case, was secured and would have been payable on foreclosure of the security out of the sales proceeds without regard to the worthlessness of any unsecured debts Richard owed. We conclude that, even if the Security Bank indebtedness is treated as that of Richard's, the bank's debt claim against him was not worthless in 1970 when Morris discharged it. Therefore, section 166(f) does not support the claimed deduction. Petitioners' claim to a nonbusiness bad debt deduction under section 166(d)[6]/ must fail for the same reason. A deduction is allowable under *51 that section only if the debt "becomes worthless within the taxable year." Section 1.166-5(a)(2), Income Tax Regs., states that "no deduction shall be allowed for a nonbusiness debt which is recoverable in part during the taxable year." Clearly, the evidence does not show that the bank's or Morris' debt claim against Richard became worthless in 1970. 2. Deduction as Expenditure to Protect Dairy Business
As an alternative, petitioners argue that Morris leased *52 from Producers a substantial portion of the land used for his dairy operation. His retention of this lease was essential to his dairy operation because his operating permit requires him to have a designated amount of land per cow. Morris feared he would lose his lease if he allowed Producers, one of Richard's main creditors in 1969, to lose its money. Accordingly, the argument goes, Morris' payment to Security Bank in 1970 was a payment for the "management, conservation, or maintenance of property held for the production of income," i.e., his Producers lease, within the meaning of section 212. We do not think the deduction is allowable on this ground for two reasons. First, we are not satisfied that Morris' dominant motivation in making the payments to Security Bank was to protect his dairy business. Cf. United States v. Generes,405 U.S. 93, 106 (1972). We think the most reasonable interpretation of the evidence is that Richard, a young farmer who had overextended himself financially, ran into difficulty because of the low cotton prices in 1968, 1969, and 1970. As an interested parent, Morris did not want his son, in any circumstances, to fail and go into *53 bankruptcy. To help his son over this difficult period, Morris worked out the arrangement with Producers and arranged for the Security Bank loans. We think Morris' dominant motivation was to help Richard, not to protect his lease with Producers. Second, our Findings show that Morris' payments to the bank were not expenditures within the meaning of section 212. Morris' books carried the payments as receivables from Richard, thus indicating he expected to be repaid. Richard's books carried Morris' payments as notes payable. Moreover, in 1971, Richard and his wife signed a note to Morris covering the amount here in dispute as well as certain other advances Morris had made to or on behalf of Richard. Both parties treated Morris' Security Bank payments as advances or loans to Richard. As such, they are not deductible. Cf. Walsh v. Commissioner,313 F.2d 389, 392-393 (4th Cir. 1963), affg. a Memorandum Opinion of this Court. We find no ground on which the disputed deduction can be allowed. Decision will be entered for the respondent. Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.
2. /SEC. 166. BAD DEBTS. (f) Guarantor of Certain Noncorporate Obligations.--A payment by the taxpayer (other than a corporation) in discharge of part or all of his obligation as a guarantor, endorser, or indemnitor of a noncorporate obligation the proceeds of which were used in the trade or business of the borrower shall be treated as a debt becoming worthless within such taxable year for purposes of this section (except that subsection (d) shall not apply), but only if the obligation of the borrower to the person to whom such payment was made was worthless (without regard to such guaranty, endorsement, or indemnity) at the time of such payment.↩
3. / In placing our decision on this ground, we do not intend to imply that the notes to Security Bank, signed only by Morris, can be treated as Richard's obligation for the purposes of sec. 166(f)↩. Since Richard retained substantial assets and a potentially successful farming business, as discussed in the text, we think it clear his obligation to the bank or to Morris was not worthless, and we rest our decision on that ground. We do not reach respondent's contention that Morris borrowed money from the bank and reloaned it or made a gift of it to Richard.
4. / A cotton allotment is a capital asset subject to purchase and sale. George Wynn Smith,55 T.C. 133, 136-137 (1970); Rev. Rul. 66-58, 1966-1 C.B. 186↩. Richard's stipulated balance sheets do not indicate his cotton allotments were included as assets.
5. /↩ At one point in his testimony, Morris described Richard's financial difficulties during the period in controversy as the "problem that he had in '69 and '70."
6. /Sec. 166(d) states, in part: (d) Nonbusiness Debts.-- (1) General rule.--In the case of a taxpayer other than a corporation-- * * *
(B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩