WILLIAM D. COLBURN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Colburn v. Commissioner
Docket No. 3625-71.
United States Tax Court
T.C. Memo 1977-29; 1977 Tax Ct. Memo LEXIS 412; 36 T.C.M. (CCH) 133; T.C.M. (RIA) 770029; February 3, 1977, Filed E. Grubic, for the petitioner. E. H. Ciranni, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined a $157,494.09 deficiency in petitioner's 1966 income tax, together with additions to tax under sections 6651(a) [1] (failure to file a timely return) and 6653(a) (negligence and intentional disregard of rules and regulations) in the respective amounts of $39,373.52 and $7,874.70. [2] Because of concessions made *413 by the parties, the issues for decision are: (1) Whether petitioner sustained cattle losses in 1961, 1963, 1964, 1965, 1966 and 1967 in excess of the amounts allowed by respondent. (2) Whether in 1969 petitioner had a reasonable prospect of recovering money embezzled during 1968 and 1969 by his ranch manager. (3) Whether in 1966 petitioner is entitled to a deduction for cattle feed expenses in excess of the amount allowed by respondent. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are found accordingly. At the time petitioner filed his petition, he resided in Yerington, *414 Nevada. Petitioner was engaged in ranching in Nevada from 1959 through February 10, 1969. During 1959, 1960 and a part of 1961, his ranching activities were primarily "fat cattle" operations. Petitioner purchased Hereford and Angus beef cattle, fattened these animals and sold them to packing houses. These operations were financed through the Nevada Livestock Production Credit Association ("NLPCA"), which had a lien on petitioner's purchased cattle. The NLPCA also maintained records of petitioner's current purchased cattle inventory and of his cattle purchases and sales. Sometime in 1960 or 1961 petitioner began to phase out his "fat cattle" operations and began marketing cows and bulls suitable for the breeding of dairy cattle. Initially petitioner purchased day-old calves, nurtured them, and then sold them at maturity. However, after the price of day-old calves increased, petitioner began to raise calves at his own facilities in California. Both the purchased and the raised calves were fed powdered milk or whole milk until they reached a weight of approximately 200 pounds, and were then put on a diet of grain or hay. The final stage of this operation was conducted at petitioner's *415 ranch in Yerington, where feed costs were low. After reaching maturity the animals were shipped to Los Angeles for sale. The dairy cattle operation proved to be less successful than petitioner had anticipated. This was in part due to the high mortality of the calves resulting from the great variations in temperature in Yerington, improper care, and overfeeding. Sometime in 1962 an audit of petitioner's income tax returns for 1959 and 1960 was undertaken. In the course of that audit petitioner claimed that on December 31, 1960 he had 1,767 head of purchased cattle on hand with a cost basis of $255,142.20, and Revenue Agent Standard accepted these amounts. In 1968 respondent initiated an audit of petitioner's income tax returns for 1961 and 1962 in connection with a refund claim filed by petitioner for a prior year. The refund claim was based on alleged losses incurred in 1961 and 1962 which petitioner was attempting to carry back. Revenue Agent Bowen conducted this audit. At some point the audit was enlarged to include the years 1963 through 1967; petitioner had failed to file returns for any of these latter years. In January 1968, Revenue Agent Bowen requested petitioner *416 to make a physical count of cattle on hand, which petitioner proceeded to do. [3]
Previously, in December 1961, the NLPCA had made a physical count of petitioner's purchased cattle. At that time the NLPCA held a security interest in petitioner's purchased cattle in connection with its financing of petitioner's cattle operation. The number of cattle accounted for in that count was substantially less than the number petitioner carried on his own books and records and the number subject to a NLPCA lien. In an effort to determine the cause of the discrepancy, Bowen investigated petitioner's records for 1959 and 1960. In the course of this investigation Bowen uncovered unreported sales of 631 head of cattle during 1959 and 1960. Thereafter, Bowen reconstructed petitioner's opening count for January 1, 1961, allowing petitioner 1, 136 head of cattle with a cost basis of $160,183.52.This reconstructed count simply adjusted the previously accepted *417 count of 1,767 for the unreported sales of 631 head of cattle. Bowen allowed death losses of 50 head in each of 1966 and 1967. Petitioner maintained inadequate books and records of cattle on hand, their purchase price, cattle sales, and the sales price, and kept no record of cattle death losses. Petitioner reported his farming income on the cash receipts and disbursements method. From 1968 until February 10, 1969, petitioner's ranching operations were managed by A. C. Ahlswede. As manager, Ahlswede possessed the authority to write checks on petitioner's bank account at the First National Bank of Nevada at Yerington. Ahlswede misused this authority and wrote checks on petitioner's account for his own personal purposes. During 1968 and 1969 Ahlswede embezzled funds from petitioner in the total amount of $94,404. In February 1969, after learning that Ahlswede had been embezzling funds, petitioner terminated Ahlswede's authority to write checks on petitioner's bank account. Thereafter, on March 24, 1969, petitioner instituted suit against Ahlswede for an accounting and to recover $12,434.43 allegedly diverted improperly from petitioner's bank account. Ahlswede counterclaimed *418 against petitioner for $36,098.78. [3] Thereafter petitioner answered the counterclaim, served interrogatories and filed an amended complaint. Although petitioner and his attorney felt confident that they would win this action, it was never formally terminated. On April 7, 1971, Ahlswede filed a petition in bankruptcy. Petitioner filed a proof of claim in the bankruptcy action. The original proof of claim was for $40,099, followed by an amended proof of claim, filed August 28, 1972, in the amount of $112,000 (which included loans made by petitioner to Ahlswede in 1967 and 1968 of $23,000). Only $80,000 of petitioner's claim was allowed by the referee in bankruptcy. Petitioner was an unsecured creditor of Ahlswede. He and the other unsecured creditors held claims for approximately $196,000 against Ahlswede's estate of approximately $75,000. *419 Originally the Bankruptcy Court had subordinated the claim of Crocker Citizens National Bank to that of these general creditors. The Court of Appeals for the Ninth Circuit [4] held that Crocker Citizens National Bank could file a claim as a general creditor against Ahlswede's bankrupt estate, entitling it to share with petitioner and the other general creditors. The Bankruptcy Court refused to authorize the trustee to pursue an appeal to the United States Supreme Court. However, petitioner requested and was granted permission by the Bankruptcy Court to pursue an appeal to the United States Supreme Court. The Supreme Court denied his petition for certiorari on October 20, 1975. [5] As of the date of this trial, petitioner had not recovered any portion of the amounts embezzled by Ahlswede, nor had any other unsecured creditor received any payment from Ahlswede's bankrupt estate. Petitioner never filed a return for 1966. Respondent issued a notice of deficiency on March 4, 1971, in which he determined that petitioner's *420 taxable income in 1966 was $299,752.44. OPINION The first issue is whether petitioner sustained cattle losses in 1961, 1963, 1964, 1965, 1966 and 1967 in excess of the amounts allowed by respondent. Petitioner does not contend that respondent's statutory notice is arbitrary or unreasonable, or that the burden of proof is on other than himself. Rule 142, Tax Court Rules of Practice and Procedure. Rather, petitioner contends that he sustained greater cattle death losses in 1961, 1963, 1964, 1965, 1966 and 1967 than respondent has allowed him, and these losses result directly and indirectly (by means of net operating loss carryovers and carrybacks) in an additional deduction for 1966. Respondent asserts that his statutory notice is correct, and that petitioner has failed to present evidence to the contrary. Petitioner has limited himself to arguing with Revenue Agent Bowen's method of calculating his cattle losses in the statutory notice rather than presenting any affirmative evidence. Petitioner, in returns filed before the year in issue, reported his farm income on the cash receipts and disbursements basis. In the case of purchased livestock held for sale, he deducted the *421 cost of such animals from their sales price in the years when the animals were sold. See section 1.61-4, Income Tax Regs. Revenue Agent Bowen, in making adjustments to petitioner's losses from the sales of purchased animals, determined that petitioner's count of purchased animals on hand on January 1, 1961, was 631 too high, and that these 631 cattle had been sold prior to 1961. In addition, Bowen allowed petitioner death losses of 50 head each in 1966 and 1967. We are convinced that Bowen's reconstruction of petitioner's January 1, 1961 cattle count was correct. Bowen determined that petitioner's livestock on hand on January 1, 1961 was in fact 1,136 head of cattle. This amount was determined under three computation methods. First by subtracting purchases and adding sales which occurred in 1961 through 1967 from the January 1968 physical cattle count and adding death losses of 100 head. Second by subtracting purchases and adding sales which occurred in 1961 from the December 1961 physical cattle count. Finally by subtracting the unreported sales of 631 which occurred during 1959 and 1960 from petitioner's December 31, 1960 cattle count. Under all three methods of computation, *422 Bowen arrived at a January 1, 1961 determination of cattle on hand of 1,136 head with a cost basis of $160,183.52. Petitioner claims that the number of purchased cattle on hand as of December 31, 1960 determined from his books and records and accepted by Revenue Agent Standard was the correct count. He asserts that the difference between Standard's December 31, 1960 count and his physical count in January 1968, after adjusting for purchases and sales, was the result of animal deaths during 1961, 1963, 1964, 1965, 1966 and 1967.[6] However, petitioner presented no evidence to substantiate his claim other than petitioner's testimony that cattle deaths in the milk fed calf program ran as high as 15 percent per year. Unfortunately, petitioner failed to make headcounts of his purchased cattle and failed to maintain continuous records of the number of purchased cattle on hand from 1961 to 1967. Petitioner apparently kept no records of animal deaths. Without more specific affirmative evidence, petitioner has failed to carry his burden of proof on this issue. See Cimarron Trust Estate,59 T.C. 195, 201 (1972). His attack on Revenue Agent Bowen's method does not carry *423 the burden of persuasion for him. Nor is respondent estopped from revising the January 1, 1961 headcount by the fact that Revenue Agent Standard accepted petitioner's higher count for December 31, 1960. Respondent is not bound in one taxable year by the factual determinations of an agent made in another taxable year. See David O. Rose,55 T.C. 28, 32 (1970); George R. Tollefsen,52 T.C. 671, 681 (1969). Moreover, the evidence shows that Revenue Agent Standard did no more than accept the headcount contained in petitioner's books and records without making any independent examination of those figures. Since the burden of proof was on petitioner to show the number of purchased cattle on hand on January 1, 1960 and since he has presented no evidence to substantiate his computations, we conclude that the number of purchased cattle on hand on January 1, 1961 was 1,136 with a cost basis of $160,183.52. The next issue is whether petitioner sustained a loss in 1969 arising from the embezzlement of funds during 1968 and 1969 by his ranch manager. The *424 year in which a taxpayer may claim an embezzlement loss depends upon when in fact the loss is sustained. Section 1.165-1(d)(3) and (d)(1), Income Tax Regs. Ordinarily this will be the year in which the embezzlement is discovered. Alison v. United States,344 U.S. 167 (1952). However, where a claim for reimbursement exists and there is a reasonable prospect of recovery on such claim, no deduction is allowed until it is reasonably certain that such reimbursement will not occur. Scofield's Estate v. Commissioner,266 F. 2d 154 (6th Cir. 1959), affg. 25 T.C. 774 (1956); section 1.165-1(d)(3), Income Tax Regs. The question of whether a reasonable prospect of recovery exists in the year the loss is discovered is essentially a question of fact. Section 1.165-1(d)(2)(ii), Income Tax Regs.; Scofield's Estate v. Commissioner,supra.Thus the question we must decide is whether at the close of 1969 there was a reasonable prospect of recovering the embezzled funds or whether such prospect was remote. Petitioner asserts that there was no reasonable prospect of recovering the embezzled funds in 1969, that he is *425 entitled to an embezzlement loss deduction in 1969 and that as a consequence he sustained a net operating loss in 1969 which is available to be carried back to 1966. We disagree. Petitioner filed an action for an accounting and for recovery of a portion of the embezzled funds in 1969. This action was not settled nor did it proceed to judgment, and no evidence was presented to show whether this claim was abandoned in 1969. On the contrary, petitioner filed a claim sometime after April 7, 1971, and an amended claim in 1972, in the Ahlswede bankruptcy proceeding to recover the embezzled funds. The claim was allowed to the extent of $80,000. Nevertheless petitioner argues that, because Ahlswede filed a counterclaim to petitioner's 1969 action, it would have been futile to pursue the action. The evidence shows that petitioner did in fact pursue his claim for reimbursement in Ahlswede's bankruptcy action. Moreover, petitioner testified that his attorneys were confident that they could succeed in the 1969 action and intended to file a motion for summary judgment in the suit. Petitioner also argues that because of Ahlswed's 1969 financial condition the prospects of recovery at *426 the close of that year were remote, nebulous and problematical. There is no evidence which shows that Ahlswede was insolvent in 1969 or that petitioner would have been unable to collect a judgment against Ahlswede. On the contrary, the evidence indicates that Ahlswede did not file a petition in bankruptcy until 1971. Moreover, if petitioner had prevailed in his efforts to have the claim of Crocker Citizens National Bank subordinated to Ahlswede's general creditors it would have been quite likely that petitioner would have recovered a substantial portion of his claim against the bankrupt's estate. In view of these conclusions we hold that petitioner had a reasonable prospect of recovering the embezzled funds in 1969 and that he is not entitled to an embezzlement loss in 1969. Petitioner next asserts that he is entitled to a deduction for feed purchases in 1966 in excess of the amount allowed by respondent. No evidence was presented to substantiate that petitioner is entitled to any additional deduction for feed. The only evidence is petitioner's testimony that he presented to the auditing agent a cancelled check which had been written in payment of the expense. Petitioner *427 asserts that the check was never returned to him by the agent. However, petitioner offered no bank statements, check stubs or bills to substantiate his testimony. Moreover, the agent denied ever having seen or having received the cancelled check. We therefore hold that petitioner is not entitled to a feed expense deduction in excess of the amount allowed by respondent. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the year in issue. ↩
2. Petitioner presented no evidence at trial and failed to argue on brief that his failure to file and to pay the tax owing was due to reasonable cause. We therefore conclude he has conceded the additions to tax. The parties stipulated that the amount of these additions to tax would be computed on the amount of the deficiency determined by this Court (taking into account net operating loss carryover deductions but not net operating loss carryback deductions).↩
3. Although the record is not clear on this point, presumably the count was of purchased cattle only since petitioner was on the cash receipts and disbursements method of accounting and did not maintain an inventory of raised cattle.↩
3. In his answer and counterclaim Ahlswede alleged that he had performed services and sold hay to petitioner having a total value of $178,228.34. Ahlswede alleged that he had been paid $80,597.44 by petitioner and he had drawn $61,532.14 against petitioner's checking account, leaving a balance still owed to Ahlswede of $36,098.78.↩
4. In re Ahlswede,516 F. 2d 784↩ (9th Cir. 1975). 5. Stebbins v. Crocker Citizens National Bank,423 U.S. 913↩ (1975).
6. Petitioner's 1962 return was accepted as filed and petitioner does not seek to change it.↩