ROBERT M. MILLER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Miller v. Commissioner
Docket No. 12719-81.
United States Tax Court
T.C. Memo 1984-423; 1984 Tax Ct. Memo LEXIS 248; 48 T.C.M. (CCH) 811; T.C.M. (RIA) 84423; August 8, 1984. Frank G. Jacobs, for the petitioner. Brian Kawamoto, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency in the amount of $8,332 in petitioner's Federal income tax for 1977. The only issue for decision is whether petitioner is entitled to a bad debt deduction under section 166 [1] with respect to certain *249 funds which he advanced to Irvine Educational Systems, a nonprofit corporation. FINDINGS OF FACT Petitioner resided in Irvine, California, at the time his petition in this case was filed. Petitioner is a chemical engineer. Throughout 1977 and for a period prior thereto, he was employed as a project manager by an aircraft manufacturer. Petitioner wanted to get into a different kind of work, and when, in January 1976, a friend named Burt Gilbard (Gilbard) suggested that they acquire and operate a privately owned law school, petitioner agreed to pursue the matter further. Gilbard was an attorney who had been working an as assistant to Egon Mittelmann (Mittelmann), the dean of an unaccredited law school named the Irvine University School of Law. Mittelmann also controlled Irvine University, Inc. (IU), a nonprofit corporation which operated the law school, and Gilbard learned that he was interested in selling out. At that time there were 125 students enrolled in the law school. Petitioner *250 and Gilbard did some rough calculations and concluded that they would need to maintain an enrollment of about 80 students in order for the school to continue in operation. Petitioner and Gilbard decided to acquire the school. To that end, they formed a nonprofit corporation under California law known as Irvine Educational Systems (IES). Petitioner and Gilbard both became directors of IES. On August 26, 1976, an agreement was concluded between IU and IES (the 1976 agreement). The agreement recited that: IU now operates as a subdivision [of] the Irvine University School of Law at 4400 Campus Drive, Newport Beach, Ca., a lawfully conducted educational institution qualified under the State Educational Code and authorized by the California Department of Education to grant and confer the degrees of Bachelor of Law (L.L.B.), Juris Doctor (J.D.), and Bachelor of Legal Science (B.L.S.). IU is the lessee of a tract of land and owner of the improvements thereon, described as premises, 4400 Campus Drive, Newport Beach, County of Orange, California. IU has determined that it is in the best interests of the University to grant full powers to manage and administer the school of law, *251 with the ultimate aim of transferring all of the said law school's rights and interests; and to lease the described premises, to IES. * * * Under the agreement, IU agreed to-- manage and administer the Irvine University School of Law with all powers, rights and privileges including all functions of the academic, fiscal and the administrative operation. * * * It was further provided that: IES shall, in consideration of its operation and collection of retained monies inuring to the law school, pay to IU annual fees in accord with the schedule attached hereto and made a part hereof * * *. The schedule referred to called for annual payments in the following amounts: Fee Schedule
First Year
$20,000
Second Year
22,000
Third Year
24,000
Fourth Year
26,000
Fifth Year
30,000
Sixth Year
33,000
Seventh Year
36,000
Eighth Year
39,000
Ninth Year
40,000
Tenth Year
45,000
Fee payable quarterly each year, twenty-five (25%) per cent to be paid by the last day of the first month of each academic quarter, commencing with the Fall Quarter, 1976, to wit, September 30, 1976. IES also agreed to take over IU's payments of rent, principal, *252 interest, taxes, and insurance "to respective payees." In addition, IES agreed to pay $16,000 into escrow by September 1, 1976. Those funds were to be paid out to IU "only after the student body of eighty tuition paying students enroll and pay their fees for the Fall, 1976 quarter." The agreement provided that, if the enrollment for the coming fall quarter was less than 80, "then the escrowed funds shall be paid back to IES at its option, and thereafter this agreement shall be null and void." This provision was modified on August 31, 1976, when IES agreed to allow the $16,000 to be disbursed from the escrow account to IU regardless of whether the enrollment had reached 80 students. The $16,000 escrow payment was funded by advances of $12,000 from petitioner and $4,000 from Gilbard. The agreement also provided: At the end of the ten year management period of the law school by IES and provided that all payments have been made to IU, IES will have complete control over the law school and IU agrees to separate the law school from IU and transfer said law school to IES. * * * Mittelmann signed the agreement for IU and petitioner signed for IES. The agreement as modified was *253 ratified at the first meeting of the IES board of directors on September 21, 1976. At the same meeting, petitioner was elected chairman of the IES board of directors. Petitioner was also elected president and treasurer at an annual salary of $1 for both positions. Petitioner was also appointed as a consultant to IES at a salary of $500 per month. Gilbard was appointed dean of the school. Petitioner "handle[d] the business side of it, paying the bills * * * looking after the property and taking care of the mundane, day-to-day activities * * * that didn't involve the classes." Problems began to develop early. Because the law school was unaccredited, its students were required to pass an examination administered by the California State Board of Bar Examiners after their first year in order to continue their studies. Only 23 percent of the students passed and this caused attrition in the school's enrollment. Further difficulties arose when petitioner concluded that, due to reduced cash flow and personal difficulties that had arisen in his relationship with Gilbard, the school could no longer continue to employ Gilbard as its dean. IES agreed to buy out the remainder of Gilbard's *254 contract for $5,000, and petitioner advanced IES the money for this purpose. Gilbard was replaced by Marcia Garcia (Garcia) in July 1977. Garcia became a member of the IES board as well as an employee. Her job title was School Administrator. In addition, she loaned IES $10,000 to help it pay its expenses. In August 1977, IES again needed additional funds to pay its operating expenses, and petitioner advanced it another $2,000. Sometime during 1977, contractual disputes arose between IES and IU regarding the terms of the 1976 agreement. Petitioner characterized these disputes as a "lack of cooperation" on Mittelmann's part. While the exact points of contention are not set forth in detail in the record, the dispute between Mittelmann and petitioner became so severe that Garcia decided that she wanted to dissociate herself from the school shortly after she had begun working there. She resigned her position in September 1977 and sought to regain the $10,000 that she had previously advanced to IES. Garcia and petitioner executed an agreement dated September 19, 1977, under which petitioner placed $10,000 in escrow. This amount was to be delivered to Garcia upon the completion *255 by her of negotiations with IU modifying the 1976 agreement with IES in certain specified respects. Garcia's negotiations with Mittelmann apparently began promisingly, but ultimately failed to produce the modifications that petitioner desired. Petitioner, nevertheless, caused the $10,000 to be delivered out of escrow to Garcia and, under the escrow agreement, acquired from her any rights that she had to repayment from IES. In October 1977, petitioner concluded that he would not advance any more money to IES, and he began to look to his lawyers to resolve his dispute with Mittelman. [2] In November 1977 petitioner sent Mittelmann a telegram informing him that he considered IU to be in breach of the 1976 agreement and that IES would make no further payments under it. He informed Mittelmann that IES would cease operating the law school, but would continue for one week in order to give IU the opportunity to resume management. The school apparently continued in operation, although the record does not reveal under whose supervision. [3]
*256 In May 1978, petitioner caused a lawsuit to be filed against Mittelmann and IU on behalf of IES asking $225,000 in damages. The minutes of IES' annual meeting for 1978, held in September of that year, indicate that: "A Court date is expected in 1980." The minutes of the 1979 annual meeting state that: "The claim against I.U. Inc. is being pursued." The minutes of the 1980 annual meeting also report on the progress of the case. The record does not reveal the disposition of this lawsuit. The Attorney General of California also filed an action against Mittelmann in 1978 or later for conversion of funds, but this action was later dropped, apparently because Mittelmann had left the country. The Internal Revenue Service issued a ruling dated August 16, 1978, granting IES tax-exempt status. In his Federal income tax return for 1977, petitioner claimed a deduction for the funds he had advanced to IES as a worthless business bad debt. The parties agree that the amount of petitioner's personal funds advanced to IES was $29,000. [4] Respondent denied this deduction in its entirety. *257 OPINION The inability to collect money payable under a contract may give rise to a bad debt deduction. The allowability of the deduction, however, is circumscribed by statute. Section 166(a), in broad terms, allows as a deduction from ordinary income "any debt which becomes worthless within the taxable year." Section 166(d)(1)(A) provides, however, that, in the case of noncorporate taxpayers, section 166(a) does not apply to "any nonbusiness debt." Instead, nonbusiness debts which become wholly worthless during the taxable year are treated as short-term capital losses, and no deduction is allowable for partially worthless nonbusiness debts. Sec. 1.166-5(a)(2), Income Tax Regs.
Petitioner contends that he advanced the $29,000 to IES so that he could obtain a salaried position in a line of work different from his aircraft manufacturing employment, citing United States v. Generes,405 U.S. 93 (1972), and that the debt obligation arising from the advances became worthless in 1977.On this theory, he claims a business bad debt deduction. To support his disallowance of the 1977 deduction taken by petitioner with respect to his advances to IES, respondent makes what *258 may be regarded as standard arguments in cases involving advances by a shareholder to his completely or substantially controlled corporation: (1) That petitioner did not create a debtor-creditor relationship between himself and IES because he had no genuine expectation of repayment; (2) that, in any event, IES' liability to petitioner was contingent on its income from its operation or, if it obtained tax-exempt status, upon contributions; (3) that the advances of funds were in the nature of capital contributions rather than loans; (4) that the advances of funds created a nonbusiness debt, deductible as a short-term capital loss, rather than a business bad debt, deductible in full from gross income; and (5) that the debt did not become worthless in 1977, the year in which it is claimed as a deduction. Because petitioner was a nonprofit, nonstock corporation which obtained a Federal tax exemption ruling only a few months after the advances of funds were made, we have difficulty in applying some of respondent's arguments to the facts of this case. In the light of all of the evidence, however, we find that petitioner has failed to show that the debts became worthless in 1977. There *259 is no standard test for determining worthlessness of a debt within a given taxable year. The determination of worthlessness depends upon the facts and circumstances of the case. Estate of Pachella v. Commissioner,37 T.C. 347, 353 (1961), affd. 310 F.2d 815 (3d Cir. 1961); Dallmeyer v. Commissioner,14 T.C. 1282, 1291 (1950). In making the determination, a court is to be guided not by an inflexible formula or a slide rule calculation but by "reasonableness, common sense and economic reality." Scovil Manufacturing Co. v. Fitzpatrick,215 F.2d 567, 570 (2d Cir. 1954); Cimarron Trust Estate v. Commissioner,59 T.C. 195, 199 (1972). It is generally accepted that the year of worthlessness is to be fixed by identifiable events which reasonably justify abandonment of any hope of recovery. Crown v. Commissioner,77 T.C. 582, 598 (1981); Feinstein v. Commissioner,24 T.C. 656, 658 (1955). Petitioner has not shown that he had abandoned hope of recovery in 1977. He had begun to "look to the lawyers" to help him in October 1977. In May 1978, in the year following the year of *260 the claimed deduction, petitioner caused the lawsuit to be filed by IES against Mittelmann and IU seeking $225,000 in damages. The minutes of the annual meeting of IES held on September 18, 1978, state: George A. Sullivan, attorney, of Yorba Linda, is representing IES. Efforts by I.U. Inc. to obtain change of venue were defeated. A countersuit has been filed naming IES and Robert M. Miller as defendants. A Court date is expected in 1980. The minutes of the annual meeting of IES on September 19, 1979, include the following: The company, though inactive in a business sense, has attempted to maintain itself in readiness for resuming activity. The claim against I.U. Inc. is being pursued. The state of California has also filed suit against Mittelmann for conversion of funds and other acts. We are seeking to have these cases joined to speed up the court date. The minutes of the annual meeting of IES on September 15, 1980, state: 1. The joining of our case to the state's case against Irvine University was rejected by the court. 2. A deposition for Irvine University and Egon Mittelmann is now scheduled for Sept 30, 1980 at the office of our attorney, George Sullivan. *261 From the foregoing it is clear that petitioner had turned to his lawyer for help before the end of 1977 and thereafter IES actively pursued its $225,000 claim against IU and Mittelmann. Petitioner, as president of IES, must have thought in 1977 that IES had a substantial claim against IU and Mittelmann because IES instituted suit on the claim less than 5 months after the close of that year. Recovery of any substantial portion of the claimed $225,000 would have dramatically improved IES' financial position. Given these facts, we cannot conclude that IES' debt to petitioner was wholly worthless at the end of 1977. Petitioner's entire argument on the worthlessness of the claims against IU and Mittelmann consists of his own statements that "the likelihood of payment by IRVINE EDUCATIONAL SYSTEMS was extremely dubious" and that he "did not hold out much hope of recovery against Mittelmann and IU." These remarks, unsupported by objective evidence and inconsistent with the thrust of the minutes referred to above, fall well short of carrying petitioner's burden of proving that the debt became worthless in 1977. The trial record does not contain copies of the pleadings in the case or *262 the depositions referred to in the 1980 minutes or any other objective facts which would enable the Court to make a finding on the merits or lack of merit of the lawsuit. Accordingly, petitioner has not carried his burden of showing that the debt became worthless in 1977. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. All "Rules" references are to the Tax Court Rules of Practice and Procedure.↩
2. He described his decision as follows: [T]here wasn't going to be a way to deal with * * * [Mittelmann] equitably and reach an agreement. * * * At that point I began to look to the lawyers to help me. I realized that there was no way to win with Mittelmann because he was not going to cooperate in any way ever. I needed to separate myself from the institution, not advance any further funds to it and just allow life to take its course. ↩
3. Petitioner testified: "I honestly didn't pay any attention to who took over when I left."↩
4. This total is composed of the $12,000 advanced by petitioner at the time of the 1976 agreement, the $5,000 advanced to buy out Gilbard, the $2,000 advanced to meet expenses in 1977, and Garcia's $10,000 claim acquired in 1977.↩