ORRIN W. FOX AND EBBA FOX, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

RICHARD L. FOX AND KATHRYN S. FOX, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1867–66, 1868–66. Filed September 9, 1968.

*J. Patrick Whaley* and *Stuart T. Peeler*, for the petitioners.
*Marion Malone*, for the respondent.

TANNENWALD, *Judge:* Respondent determined deficiencies in petitioners' income taxes for their taxable years ending December 31, 1962, as follows:

| Petitioner | Docket No.— | Deficiency |
|---|---|---|
| Orrin W. Fox and Ebba Fox | 1867–66 | $36, 560. 14 |
| Richard L. Fox and Kathryn S. Fox | 1868–66 | 36, 816. 87 |

All matters in issue involve the affairs of the Fox Investment Co., a partnership, in which petitioners Orrin W. Fox and Richard L. Fox were sole and equal partners. Consequently, both dockets were consolidated for trial and decision. Petitioners' concessions leave two issues for our consideration:

(1) Whether petitioners are entitled to an abandonment loss deduction for the unrecovered basis of improvements on certain property they sold, and, if not, what the proper treatment of the unrecovered basis should be.

(2) Whether petitioners are entitled to business bad debt deductions in the amount of $98,355.90.

### FINDINGS OF FACT

#### General

Some of the facts are stipulated and are found accordingly.

Petitioners Orrin W. Fox and Ebba Fox are husband and wife, as are petitioners Richard L. Fox and Kathryn S. Fox. Petitioners all resided in Pasadena, Calif., at the time of the filing of the petitions herein. Each couple filed a joint Federal income tax return for the calendar year 1962 with the district director of internal revenue, Los Angeles, Calif. Richard Fox is the son of Orrin Fox. All subsequent references to petitioners shall be deemed to mean Orrin and Richard.

Petitioners, through the vehicle of corporations, sold, leased, and serviced trucks and construction equipment. They had considerable familiarity with the construction industry. Petitioners also were equal partners in Fox Investment Co. which during 1962 maintained its books and records on a cash basis with the exception of certain receivables.

#### Issue 1. The Abandonment Loss

In 1961, the partnership owned improved land on the 2300 block of East Colorado Boulevard in Pasadena. Petitioners' corporations conducted business on this property.

In the summer of 1961, the partnership entered into negotiations with Safeway Stores, Inc. (hereinafter referred to as Safeway), for the sale

of the East Colorado Boulevard property. The partnership did not instigate these negotiations.

Safeway was only interested in the property as a site for a new grocery store; it did not want the existing improvements. It would have paid the same for the land with or without the improvements. Throughout the negotiations, Safeway did not investigate and did not consider the cost of clearing the site. It expected that most of the improvements would be removed.

After discovering, during the negotiations, that Safeway had no use for the buildings, petitioners decided that, if Safeway purchased the property, they would attempt to move and to continue to use the buildings to the extent economically feasible. They did not, at that time, investigate the feasibility of moving the improvements. Nor did they inquire into the availability of another business site.

On November 3, 1961, the partnership executed an agreement giving Safeway an option until May 1, 1962, to buy the property for $900,000, with credit for the $10,000 option price. Under the terms of the agreement, if the option was exercised, the partnership could continue to occupy the premises for 6 months after the sales escrow was closed, at a rental rate of $1,250 per month.

At the partnership's request, the following sentence was inserted in the rider to the agreement, which was prepared by Safeway and generally followed its form of contract:

Prior to the date Seller delivers exclusive possession of the property to Buyer, Seller may remove any or all improvements or salvage from the property. * * *

The clause in Safeway's form contract relating to damage to improvements was struck, but the following form clause was left intact:

Seller hereby grants unto the Buyer the exclusive right and option to purchase * * * that certain property, *together with all the improvements and appurtenances* thereon. [Emphasis supplied.]

The emphasized portion above was permitted to remain on the theory that the matter was adequately taken care of by the rider.

The partnership was motivated to make the sale by the attractiveness of the price offered and the opportunity for petitioners to modernize their facilities through a change of location.

On May 1, 1962, Safeway exercised its option and on June 19, 1962, the sales escrow was closed. In May, petitioners began looking for a new business location. They experienced some difficulty because of the fact that no one property owner had the necessary 4 or 5 acres at any of the locations they considered. Eventually, they secured an acceptable property on the 3400 block of East Colorado Boulevard. The escrows were closed with respect to this property on November 2, 1962.

In early October 1962, petitioners engaged architects to make a

study for a new plant layout at the new location, including the feasibility of utilizing the old improvements. They had not done this before because they had not known where the business would relocate. By October 25, 1962, the architects had determined that, with the exception of a portion of the materials (roofs and wood partitions), most of the improvements could not be economically moved and used at all. Accordingly, invitations were sent to submit bids to move the usable portion of the improvements and for salvage of the remainder. On November 13, 1962, the bids received were opened. A $27,186 bid from Basore Moving Co. that included $1,500 for salvage was accepted. On November 14, 1962, having learned the full cost of relocating, petitioners sought to persuade Safeway to give up its agreement and to accept other property. Safeway refused but did consent to an extension of the partnership occupancy and the time for removal of improvements until March 19, 1963. Petitioners tried at least twice more to persuade Safeway to give up its agreement, but Safeway remained adamant.

The move to the new location started in December 1962 and petitioners' businesses were completely out of the Safeway site by March 1963. The removal of the improvements by way of salvage and demolition was not completed until after Safeway began its construction in 1963.

After crediting the $1,500 salvage, the partnership had an unrecovered basis of $144,128.39 which it deducted as an abandonment loss on its 1962 return.[1]

## Issue 2.   The Bad Debt Deductions

### T. J. Haddock Debts

In early 1960, the partnership owned all of the stock of the Fox Truck Leasing Corp. (hereinafter sometimes referred to as the Fox Corp.), whose main business was leasing construction equipment and heavy-duty construction trucks. On March 3, 1960, Fox Corp. entered into a rental agreement with B & T Trucking, Inc. (hereinafter referred to as B & T). The agreement provided for a 3-year lease of certain specified equipment at a monthly rental of $5,000. The obligations of B & T under the agreement were guaranteed by T. J. Haddock. T. J. Haddock had an unspecified interest in J. E. Haddock, Ltd., with which petitioners had done valuable business for many years.

In the latter part of 1960, B & T became delinquent in its rental payments. After unsuccessful attempts at collection and prior to Feb-

---

[1] Although there was some problem at the trial as to amount of the reduction of the partnership loss in terms of the value of the salvage, respondent no longer appears to question the $1,500 reduction used by petitioners.

ruary 1961, petitioners sued T. J. Haddock personally on his guarantee and also sought to reach his interests in certain real property at "Montebello," in J. E. Haddock, Ltd., and in one "Haddock Transportation Company."

Petitioners estimated that they could get $30,000 on the Haddock guarantee out of the "Montebello" property. They did, in fact, get about $35,000 in 1963 or later.

On February 8, 1961, some time after petitioners had filed suit against T. J. Haddock personally, J. E. Haddock, Ltd., filed a voluntary petition for an arrangement under chapter XI of the Federal Bankruptcy Act. Orrin Fox attended creditors meetings and participated in the successful procurement of a bid of $700,000 for certain real estate owned by J. E. Haddock, Ltd.

As of December 18, 1962, the account receivable from B & T was carried on Fox Corp.'s books at its face value, $118,641.34.

Based on the foregoing and on conversations with the referee and receiver in the chapter XI proceeding, Orrin Fox thought on that date that the partnership claim against B & T would eventually be paid in full.

On December 18, 1962, Fox Corp. had an account receivable from T. J. Haddock on its books in the amount of $518.56, representing a part of his obligation on the guarantee.

On December 18, 1962, petitioners caused the Fox Corp. to be totally liquidated and its assets, including the debts here in question, to be distributed to the partnership. For purposes of computing gain or loss on the liquidation, the accounts receivable from B & T and from T. J. Haddock personally were valued at face.

On December 28, 1962, as a result of a conversation with the receiver in the chapter XI proceeding, Orrin Fox was informed that the assets of Haddock, Ltd., would only cover about half of its liabilities and that there was no possibility of any surplus for the stockholders.

On December 31, 1962, the partnership charged off all of the $518.56 account and $88,641.34 of the B & T account, allowing for a partial recovery of $30,000.

### Torrance Debt

In March 1962, the Fox Corp. received a bad check from Torrance Sand & Gravel Co. (hereinafter referred to as Torrance). Torrance had been a good customer for many years and, although it had on occasion been slow in its payments, up until 1962 it had always paid. The president of the company at first assured Fox Corp. that the bad check would be paid. But in the early fall of 1962 he stated that the company would go under without outside financial help.

On December 18, 1962, the account receivable from Torrance was carried on Fox Corp.'s books at its face value, $9,196. Orrin Fox

thought that at that time this amount would be paid in full. Consequently, upon the liquidation of Fox Corp., the debt was valued at face by the partnership.

During the last week of 1962, Orrin Fox discovered that some of Torrance's creditors were seriously considering filing an involuntary bankruptcy proceeding against Torrance.

On December 31, 1962, the entire account receivable from Torrance was charged off on the partnership's books.

The partnership customarily reviewed the collectibility of its accounts receivable at the end of each calendar year in order to determine whether and to what extent they should be charged off.

OPINION

## Issue 1. The Abandonment Loss

This issue is clear-cut and involves the proper treatment of the unrecovered basis of the improvements on the property which the partnership sold to Safeway. Petitioners, relying on *Feldman* v. *Wood*, 335 F. 2d 264 (C.A. 9, 1964), argue that they intended to utilize the improvements and that their decision to "abandon" was reached subsequent to and independently of the sale to Safeway. Consequently, they contend that they are entitled to an ordinary loss deduction. Respondent, relying on *Standard Linen Service, Inc.*, 33 T.C. 1 (1959), and *Simmons Mill & Lumber Co.*, T.C. Memo. 1963–185, asserts that the decision to "abandon" the improvements was an integral part, and therefore not independent, of the sale to Safeway with the result that the unrecovered basis should be considered only as an adjustment to the price paid by Safeway thereby merely reducing petitioners' capital gain. We hold for respondent.

Concededly, as things turned out, the partnership suffered an economic loss but this does not end the matter. We still must determine whether that loss gives rise to an ordinary deduction for tax purposes under section 165 [2] or whether, because of the relationship of the loss to the sale to Safeway, the unrecovered basis of the improvements must be regarded as a cost of that sale, i.e., "an amount properly chargeable to capital account" under section 1016. The ultimate question turns upon the state of mind of the partnership (i.e., petitioners) at the time the transaction which resulted in the alleged abandonment took place.[3]

---

[2] All references are to the Internal Revenue Code of 1954.

[3] Compare sec. 1.165–3, Income Tax Regs., outlining the circumstances under which a purchaser of property is entitled to a demolition loss, with sec. 1.167(a)–8 which specifies the circumstances under which a loss due to retirement of a physical asset occurs.

The fulcrum of petitioners' position is that because of the indifference of Safeway to acquiring the improvements, because petitioners sought to, and did, retain the privilege of removal or salvage, and because of their efforts to persuade Safeway to accept another location, the improvements were not sold to Safeway. *Ergo*, petitioners conclude that the partnership had the requisite state of mind, i.e., to utilize and not demolish the improvements. We think that petitioners' view is overly simplistic. Granted that the improvements were not sold to Safeway (and we do not think they were), it is still possible that the partnership did not have that degree of intent to use the improvements sufficient to support their claimed loss deduction. The elements of the instant situation upon which petitioners rely may be indicia of that intent but they are not the sole determinants.

Petitioners assume that all that is necessary is that a taxpayer have *some* such intent. They seem to maintain that it is immaterial how ill-defined or floating that intent may be. We disagree. We recognize that in many situations of the type involved herein, the sale of the underlying property may be the generating force for a taxpayer's determination as to what to do with the improvements and, in that sense, the sale and the intention subsequently to use the improvements will always reflect a degree of interdependence. In theory, at least, it can be thus argued that under such circumstances the "independence of sale" test (see *Standard Linen Service, Inc.*, *supra* at 18) can never be satisfied. But we would not go so far as to require the taxpayer always to show that he would not have made the sale unless he could use the improvements in order to satisfy that test. Nor do we think that the seller-taxpayer's ability to utilize the improvements must be guaranteed in order to sustain an ordinary loss deduction upon abandonment. We do believe it necessary, however, that the taxpayer should have a fixed and meaningful intent to utilize the property which is founded upon sufficient facts to permit the conclusion that there was a reasonable likelihood that such utilization would occur.[4] In short, although there may be some risk of inability on the part of the taxpayer to carry out his plans, the odds should be that such eventuality would not materialize.

Petitioners did not enter into their negotiations with Safeway with a fixed intent to sell the land but retain the improvements. They decided to retain the right of removal and salvage only after Safeway had indicated its lack of interest. Since Safeway had no use for the improvements, their reservation of rights cost them nothing in bargaining power. At the time the contract was made, petitioners did not

---

[4] Compare the factual situation which existed in *Jerome S. Murray*, T.C. Memo. 1965–148, affirmed per curiam on another issue 370 F. 2d 568 (C.A. 4, 1967).

know how much they would be able to relocate. They did not even know where they would go. The fact that petitioners were experienced businessmen familiar with the construction industry does not require the conclusion that they had made any realistic judgment as to the feasibility of utilizing the old improvements. Indeed, it seems to us that this expertise would have dictated careful investigation of possible utilization beforehand. The fact is that it was not until October 1962, long after Safeway had exercised its option, that petitioners began to explore the situation and learned that the old improvements could not be used. To be sure, petitioners did not settle upon a new location until that time, but it seems to us that the general feasibility of utilization could have been the subject of prior investigation.

Petitioners undoubtedly had some thought of using the old improvements. A realistic view of the situation, however, compels the conclusion that petitioners at best had an ill-defined or floating intent, perhaps more accurately described as a hope that such utilization would be possible. Indeed, it can even be said that their attitude was one of indifference. Under the circumstances herein, we do not think it significant that, subsequent to their discovery that the old improvements could not be used, petitioners tried to persuade Safeway to let them out of their contract. We think such attempt merely reflected petitioners' conclusion that the full cost of relocating the business as a whole (and not simply the cost of utilizing the old improvements) would be too great. Petitioners' basic objective was to sell the property to Safeway, with or without improvements as Safeway might determine, and they succeeded in doing so at a handsome price of $900,000, more than seven times cost of the land and more than three times the unrecovered cost of the land and the improvements.

Petitioners seek to distinguish *Standard Linen Service, Inc., supra*, on the ground that the taxpayer therein sold "cleared" land and that the clause in the contract requiring removal was inserted at the instance of the purchaser. We think that such elements as these are, as we have pointed out, at most factors which should be taken into consideration in determining the ultimate issue of intent and that they do not require us to reach a different conclusion herein. We reject, for similar reasons, petitioners' effort to distinguish *Simmons Mill & Lumber Co., supra*, heavily relied upon by respondent. In short, the issue in those cases, as herein, was one of fact with the various elements involved being merely signposts along the path to the ultimate factual determination. Nor do we think that petitioners can find sufficient comfort in *Feldman v. Wood, supra*. That case turned upon the legal interpretation to be given to section 1.165–3(b) (2) of respondent's regulations which, by its specific terms, applies to the

deduction by a lessor.[5] It clearly has no relevancy to this case. Moreover, the Court of Appeals supported its holding by reference to section 1.167(a)(4), Income Tax Regs., which permits lessors to depreciate improvements even if the period of the lease is longer than the useful life of the improvements. That section is similarly irrelevant here. Thus, while *Feldman* deals with a problem analogous to that in this case, the considerations which controlled its resolution were quite different.

In light of the foregoing, we think that it was incumbent upon petitioners herein to show that the intent of the partnership to utilize the improvements was fixed and a sufficiently significant force so that one could conclude that the later "abandonment" was, at the very least, an unlikely, if not nonexistent, prospect at the time of sale. This we think petitioners have failed to do.

We therefore hold that they had no deductible ordinary loss from the inability of the partnership to utilize the bulk of the improvements and that the unrecovered basis of the improvements was properly chargeable to capital thereby reducing the gain on the sale to Safeway. Sec. 1016. *Standard Linen Service, Inc., supra;* cf. *Mark L. Gerstle*, 33 B.T.A. 830, 842 (1935), affirmed on another issue 95 F.2d 587 (C.A. 9, 1938). See *Blumenfeld Enterprises, Inc.*, 23 T.C. 665, 671 (1955), affirmed per curiam 232 F.2d 396 (C.A. 9, 1956).

## *Issue 2. The Bad Debts*

On December 18, 1962, the Fox Corp. was liquidated and its assets distributed to the partnership. Among these assets were five accounts receivable that were carried over onto the partnership's books at face value and valued accordingly for the purpose of computing gain on the liquidation. On December 31, 1962, the partnership charged off part of one of these debts and all of the other four and took deductions therefor under section 166(a). Respondent disallowed the deductions in their entirety.[6] Petitioners have conceded the disallowance of two of these bad debts totaling $3,229.95.

In order for petitioners fully to succeed, they must prove that the debts were worth face value on December 18, 1962, and, with the exception of $30,000 of the B & T debt, were worthless 13 days later,

---

[5] While, for a temporary period after closing, the relationship between the partnership and Safeway was technically that of lessee and lessor, we do not have before us the question of any deduction by Safeway. Indeed, it can be argued that subpar. (2) of sec. 1.165–3(b) applies only where a lease defines the basic relationship between the parties and not where it is simply incidental to a sale of the underlying property.

[6] The technique adopted by the partnership enabled petitioners to increase the long-term capital gain reported by them on the liquidation of Fox Corp., claim that their basis in the debts was the face value thereof (secs. 331(a)(1) and 334(a)), and then take an ordinary deduction for worthless bad debts.

on December 31, 1962. The record herein is woefully inadequate to sustain petitioners' burden of proof to any degree on this issue. Accordingly, we sustain respondent's determination.

The only testimony with respect to the debts was that of Orrin Fox. Much of it was based on hearsay and all of it at best reflected no more than Fox's unsupported judgment as to when the worthlessness occurred. With one possible exception, all of the events which the partnership relied upon to support the writeoffs on December 31, 1962, had occurred long before December 18, 1962. With respect to the accounts receivable from B & T and T. J. Haddock, there is no probative evidence that either of them in fact had insufficient assets with which to make payment. All that appears is that efforts to collect from B & T had been generally unsuccessful and that, Fox discovered, at some point of time during the latter part of 1962 and contrary to his expectations, that J. E. Haddock, Ltd., in which T. J. Haddock had an unspecified interest, would not have enough to pay off its debts. Even if we assume that Fox did not learn of this until after December 18, 1962 (as to which the record is far from clear), there is every indication that all of the facts, which might support the conclusion that the available assets were insufficient, were in existence and should reasonably have been known to Fox prior to that date. In this connection, we note that the so-called bankruptcy proceeding involving J. E. Haddock, Ltd., was based merely upon inability to meet its debts as they matured and not upon an actual excess of liabilities over assets. With respect to the Torrance account receivable, it appears that Fox discovered, in the latter part of December 1962, that some of Torrance's creditors were considering filing an involuntary bankruptcy proceeding against Torrance. Aside from the question whether such a proceeding would necessarily have been the determining factor, there is no evidence that such a proceeding was in fact instituted. Nor were we furnished with any information regarding the nature or value of any assets which Torrance may have had. In addition, there is an indication that, sometime in 1963, an attempt was made to rehabilitate Torrance, in which petitioners participated.

In sum, petitioners seek to justify their position on the basis that Orrin Fox's unsupported opinion is sufficient to sustain the valuation of the accounts receivable at face on December 18 and that this same opinion plus the customary yearend chargeoff procedure used by the partnership is sufficient to support the claimed worthlessness on December 31. Mere belief that a debt is bad is insufficient to support a deduction for worthlessness and the fact that such belief may have been the foundation for the procedure adopted by the partnership is immaterial. It was incumbent upon petitioner to show sufficient

objective facts from which it could be concluded that the accounts receivable were worth face (or at least more than $30,000) on the former date and worth only $30,000 on the latter date. *Lehman* v. *Commissioner*, 129 F. 2d 288 (C.A. 2, 1942), affirming a Memorandum Opinion of this Court; *Earl V. Perry*, 22 T.C. 968, 973 (1954); sec. 1.166–2, Income Tax Regs.; cf. *Charles W. Steadman*, 50 T.C. 369 (1968); 5 Mertens, Law of Federal Income Taxation, sec. 30.29, p. 77 (Zimet rev. 1963).

We sustain respondent's determination that, with the exception of $30,000 of the account receivable due from B & T, the debts in question had a zero value in the hands of Fox Corp. on December 18, 1962.[7]

*Decisions will be entered under Rule 50.*

---

[7] Respondent in disallowing the bad debt deduction, made corresponding downward adjustments in the amount of gain realized by the partnership on the liquidation of Fox Corp.