FRANK A. WITKOWSKI and SHIRLEY M. WITKOWSKI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT
Witkowski v. Commissioner
Docket No. 5664-75.
United States Tax Court
T.C. Memo 1978-25; 1978 Tax Ct. Memo LEXIS 493; 37 T.C.M. (CCH) 153; T.C.M. (RIA) 780025; January 19, 1978, Filed *493 Petitioner was shot during a hold-up attempt while making deliveries on his milk route business. Thereafter, he made a good faith effort to sell the route, but was unable to do so. Petitioner transferred the route to milkmen contiguous to his route. Concurrently, the transferees agreed to collect petitioner's outstanding accounts. Held, petitioner failed to prove he did not transfer the route as an inducement to the transferees to collect his accounts. Therefore, the transfer of the route was a sale or exchange of a capital asset. Held,further, respondent's determination of transportation expense upheld. Held,further, amount of bad debts determined under Cohan rule. Held,further, respondent's determination of salary expense upheld. Held,further, petitioner received ordinary income under sec. 1245 on the sale of his truck James D. O'Connell, for the petitioners. Andrew B. Shaffer and Robert A. Dobbin, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in petitioners' income tax and additions to the tax under section 6653(a) [1] *494 as follows: Addition to Tax Year
Deficiency
Section 6653(a) [2]
1971
$23,437
$1,172
1972
1,699
85 Concessions having been made, the following issues remain for our consideration: (1) whether petitioners are entitled to ordinary loss or capital loss on the disposition of a milk delivery route business. (2) the amount of truck expenses, bad debt expenses, salary expenses, and other miscellaneous business expenses incurred by petitioners in the milk delivery route business during 1971. (3) whether petitioner had ordinary income on the sale of his truck. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference. Petitioners Frank A. Witkowski and Shirley M. Witkowski, husband and wife, resided in Belleville, Mich., at the time of filing their petition herein. [3] Petitioners filed joint income tax returns for the calendar years 1971 and 1972. While the record does not disclose the location in which the returns were filed, petitioners resided in Belleville, Mich., during the years in issue. *495 In 1960, petitioner purchased a Twin Pines Farm Dairy (hereafter Twin Pines) milk route from Robert Servo. The total purchase price of $20,519.59 reflected $4,019.59 for accounts receivable, $1,000 for a truck, and $15,500 for 540 points in the business. [4] Petitioner was also required to purchase $3,500 of stock from Twin Pines to acquire the distributorship. The truck was later replaced by petitioner with a new truck purchased in 1964. In May 1971, petitioner was shot during a hold-up attempt while making deliveries. Because of this incident, he decided to sell his business and refused to make any future deliveries. Twin Pines replaced petitioner with other drivers who continued to make deliveries on petitioner's route while petitioner attempted to sell it. Petitioner posted his route on a bulletin board but during the next seven weeks did not receive any offers of purchase and *496 thereafter petitioner transferred his milk route to John Hewitt (hereafter Hewitt) and Charles Camalleri (hereafter Camalleri), route owners contiguous or nearby to his who thereby absorbed his route. Separate contracts were executed by Hewitt and Camalleri, but both provided substantially the same terms. Hewitt and Camalleri purchased at face (for a total of $3,072.53) all of petitioner's outstanding accounts receivable. However, any accounts which they were unable to collect for petitioner and which were still outstanding 45 days after purchase were to be returned to petitioner and reduce the sales price by the face value of such accounts. At least 80 percent of the accounts were finally collected. Had petitioner turned them over to a collection agency, he would have had to pay a percentage of all amounts collected. Moreover, petitioner had bad results in the past with collection agencies. No amount was paid for the 400 points of retail business. [5]
At the same time he transferred his milk route, petitioner sold *497 the truck which he had used in his business to Camalleri for $600. During 1971, petitioner incurred actual expenses of $492.67 operating the truck. On his 1971 return, petitioner claimed 14,510 miles at 12 cents per mile as transportation expenses for driving his truck, though at trial he claimed expenses for 14,600 miles based on his monthly records. Petitioner would drive his truck to the dairy every morning and load the truck. He then returned home for breakfast and returned to his route, a total of 30 miles. Apparently, petitioner had two ends of his route each of which was 15 miles in length. After making his deliveries (one end of the route each day), petitioner would return home for lunch, another round trip of 30 miles. He then returned to the same end of the route to collect his accounts and solicit additional business. During the time petitioner operated the route in 1971, he had 86 delivery days (4 days per week). Petitioner did not count in his computations the mileage from his home to the dairy in the morning or from the dairy to home in the evening. However, he did count the mileage incurred in driving home for lunch and breakfast and returning to his route. Petitioner *498 also doubled the 15 miles traveled on the route to account for time his truck was sitting idle on his route. One day per week, for 21 weeks, petitioner would solicit customers and collect accounts.Petitioner calculated that he drove approximately 60 miles per day on these days, including the 30-mile round trip incurred for his returning home for dinner. After petitioner was shot and the replacement driver took over the route, petitioner computed that the truck was driven approximately 70 miles per delivery day (total of 27 days) before the business was transferred. OPINION Respondent contends that the transfer of the route was a sale or exchange of a capital asset within the meaning of section 1222(4), giving rise to a long-term capital loss. Moreover, such loss would be deductible under section 165(a) only to the extent allowed under sections 1211 and 1212 due to the operation of section 165(f). Petitioner contends that the business was not a capital asset, or in the alternative that the transfer was either an abandonment of his route or involuntary conversion. Since abandonment is not a sale or exchange, the loss would result in an ordinary loss, fully deductible under section *499 165(a). If we find that the disposition was not an abandonment, petitioner contends that the transfer (and loss) was due to involuntary conversion entitling him to section 1231 treatment. Under the particular facts of this case, application of section 1231 would result in ordinary loss on the "conversion" of the business. Petitioner relies on section 1221(2) which excludes from the definition of capital asset, in part, depreciable property used in a trade or business. It does not appear from the record that petitioner ever attempted to depreciate the cost, nor is there anything in the record which provides any basis whatsoever for depreciating this cost, nor has petitioner cited any cases in support of his proposition. Respondent determined that the points purchased represented goodwill. Since petitioner offered nothing to rebut respondent's position, we hold that the ownership of the route was a capital asset with an indefinite life and nondepreciable. Section 1.167(a)-3, Income Tax Regs.[6]
There is also nothing in the record which would give rise to a claim of involuntary conversion. The fact that petitioner *500 would not or could not continue in his business due to his fear of being robbed is not an involuntary conversion of the business. Petitioner presented no evidence to show that his business was destroyed, in whole or in part, during 1971. Indeed, when he transferred the route, there were 400 points of business remaining and petitioner was actively engaged in seeking new customers. We are, therefore, left with the question of whether the disposition was an abandonment. The issue here is simply whether it was essential to the transfer of the route that the purchaser also acquire the accounts receivable. If so, there can be no abandonment since the property was transferred to another as part of a sale transaction. If, however, petitioner's transfer of the route was independent of the sale of receivables, then the transfer would qualify as an abandonment. Fox v. Commissioner, 50 T.C. 813, 818-819 (1968), affd. per curiam by an unreported order (9th Cir. 1970); Standard Linen Service, Inc. v. Commissioner, 33 T.C. 1, 17-18 (1959).
We do not believe petitioner has shown that he would have transferred his routes even had the transferees not agreed to purchase his accounts. [7] Nor is there *501 anything in the record to indicate the transferees purchased the accounts (or accepted the obligation to collect the accounts) as something other than a necessary inducement to petitioner's transferring the routes to them. Petitioner did make a good faith effort to sell his route and had decided he would not be able to do so. His testimony in regard to the accounts and the transfer of the route was that he was trying only to collect his outstanding bills at the time of transfer. However, this does not show that petitioner had already abandoned the route. Rather, it tends to show that petitioner used the route as an inducement to the transferees to collect his accounts. The written contractual agreement is further evidence that there was an inducement. Although the transferees could, in effect, return all uncollected *502 accounts after 45 days, we believe they were under a contractual duty to use their "best efforts" to collect and could have been sued for failure to do so. In fact, they collected at least 80 percent of the accounts. This is apparently a higher percentage than petitioner could have realized through a collection agency. Moreover, a collection agency would have only paid petitioner a certain percentage of the collection, not the 100 percent the transferees agreed to pay here. Truck Expense
On his 1971 return petitioner claimed 14,510 miles at 12 cents per mile as transportation expense for driving his truck. At trial, based on his monthly record sheets, petitioner claimed an additional 90 miles. Respondent allowed $492.67 as actual expenses during the year. Petitioner does not challenge the $492.67 as representing his expenses, but contends he should be entitled to the higher mileage allowance. [8] *503 Respondent concedes that in the absence of detailed records, the truck expense deduction may be based on a reasonable reconstruction of mileage. Based on petitioner's testimony, we find the total mileage allowable in computing his expenses is 3,615 miles. This is computed as follows: (1) There were 86 delivery days driven by petitioner from the first of the year until he was shot. The route had two ends, each 15 miles long. Petitioner drove one end each day twice: once for deliveries in the morning and once for soliciting customers and collecting bills in the afternoon, for a total of 30 miles. Petitioner in his computations doubled this to 60 miles to account for idling time, but this, of course, does not count toward the mileage calculations. Petitioner included in his mileage computations miles driven home (and back) from the dairy to eat breakfast after loading up the truck but before making his deliveries (30 miles round trip). Similarly, petitioner counted mileage driven home for lunch after making deliveries and then returning to his route to make collections (30 miles round trip). [9] *504 Respondent disallowed both of these latter trips. Section 262 disallows any deduction for "personal, living, or family expenses" except as otherwise expressly provided in the Internal Revenue Code. Commuting expenses are nondeductible personal expenses, section 1.162-2(e), Income Tax Regs.; Fausner v. Commissioner, 413 U.S. 838 (1973), rehearing denied 414 U.S. 882 (1973). Clearly, travel expenses for meals are nondeductible personal expenses where the meals are nonbusiness related. Therefore, total mileage is 30 miles X 86 days = 2,580 miles. (2) On 21 days, petitioner made no deliveries, but drove his route to make collections and further solicit business. Apparently, he drove both ends of the route on these days for a total of 21 days X 30 miles = 630 miles. Petitioner included in his calculations for these days an additional 30 miles per day representing the 30-mile round trip from his route to home and back for dinner which must be disallowed. (3) For the 27 days after the holdup that another person made deliveries, petitioner computed that the truck was driven 70 miles. Respondent argues *505 that only 15 of these miles are deductible (the length of the route). Excluding 15 additional miles for idling, there remain 40 miles unaccounted for. We believe that these 40 miles are not properly deductible because there is nothing in the record from which we may ascertain why the additional miles were added. 15 miles X 27 days = 405 miles. Total mileage, therefore, equals 3,615 miles. (2580 + 630 + 405). At 12 cents per mile, this yields total expenses of $433.80.This is smaller than the $492.67 respondent has allowed petitioner for actual expenses. Bad Debt Expense
Petitioner offered into evidence a form prepared by his bookkeepers and which he filled out himself. The form includes $890.59 as bad debts, of which respondent allowed $254.73, representing the total bad debts through the first six months of 1971 which are corroborated by petitioner's monthly records.The additional bad debts represent the amount of accounts receivable allegedly not collected by the transferees ($636.86). Although petitioner did not introduce any books to substantiate this amount, petitioner testified that only 80 percent of the accounts sold were collected. Moreover, petitioner maintained generally *506 accurate books and was a credible witness. We do not believe it reasonable to assume that all the accounts sold were collected. Weighing against petitioner because of his lack of corroborating records, we believe a fair estimate of the accounts not paid would be $350, for a total bad debt deduction of $604.73. Cohan v. Commissioner, 39 F. 2d 540 (2d Cir. 1930). Salary Expense
On his 1971 return, petitioner claimed salary expenses of $1,090 which respondent allowed. At trial, petitioner claimed salary expenses of $1,222.79. The notation on the dairy's charge sheet (for items charged petitioner) included a notation "Misc. Persn… $1,222.79." On petitioner's bookkeeping form $1,090 was detailed as salary expenses. Without further evidence, we must hold for respondent as petitioner has not offered any corroborating evidence to show that the total $1,222.79 should be allowed. Miscellaneous Business Expense
Again, petitioner relies on the dairy's charge sheet which shows $138.20 under "Misc. Bsns." to claim a miscellaneous business expense, and again respondent asserts that such amount was not included by petitioner as an expense on petitioner's bookkeeping form. Further, petitioner *507 testified that the expense was a truck expense which it clearly was not. We do not believe on this evidence that petitioner substantiated the business purpose of the expense. Sale of the Truck
Petitioner received $600 on the sale of his truck. On his return, petitioner reduced his claimed loss from the exchange of his business by the $600. Respondent contends the $600 represents ordinary income under section 1245 and that the truck was fully depreciated. There is nothing in the record to rebut this determination. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the taxable years in issue. 2. On brief respondent conceded that the negligence penalty does not apply.↩
3. Shirley Witkowski is a petitioner herein by reason of having filed a joint return with her husband. Hereafter, references to petitioner are to Frank Witkowski.↩
4. A point is a dairy order for one quart of milk or one half-pint of cream. Thus, the size of the route was measured by its number of points.↩
5. Petitioner's business had decreased in size from its original 540 points to 400 points at the time of sale due to a gradual decline in business between 1960 and 1971.↩
6. See Manhattan Co. of Virginia, Inc. v. Commissioner,50 T.C. 78↩ (1968).
7. Petitioner nowhere challenged respondent's determination that the transfer of the accounts was a sale rather than simply an agreement by the purchasers to collect petitioner's outstanding accounts. This would not affect the result here since even if the contract was so read, the agreement would have provided approximately the same consideration as though it was a sale.↩
8. There was some evidence adduced at trial on crossexamination of petitioner by respondent which tends to show somewhat higher actual costs of running the truck. However, on brief petitioner relies solely on a claim for higher mileage than that allowed by respondent.
9. This adds up to a total of 120 miles. It is unclear from the record how petitioner arrived at the 130 miles per day figure that he used on his monthly record sheets to calculate the mileage driven.