T.C. Memo. 1996-199


UNITED STATES TAX COURT


JOHN T. BARRETT, JR. AND JANE W. A. BARRETT, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 12895-93.                    Filed April 24, 1996.


<u>William S. Barrett</u>, for petitioners.

<u>Carmino J. Santaniello, Jr.</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Judge</u>:  Respondent determined deficiencies and
penalties in petitioners' Federal income taxes as follows:

| Year | Deficiency | Penalty Pursuant to Section 6662(a) |
|------|-----------|-------------------------------------|
| 1989 | $3,800    | $760                                |
| 1990 | 10,080    | 2,016                               |

Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues we must decide in the instant case are: (1) Whether petitioners, for taxable year 1989, must recognize a capital gain pursuant to the installment sale provisions of section 453 on petitioner John T. Barrett, Jr.'s (petitioner) disposition of shares (shares) of stock in Drexel Burnham Lambert Group, Inc. (Drexel); (2) whether petitioners are entitled to a bad debt deduction for taxable year 1990 for the alleged worthlessness of a certain note issued by Drexel to petitioner as partial consideration for the purchase of the shares; and (3) whether petitioners are liable for the accuracy-related penalty pursuant to section 6662(a).

                          FINDINGS OF FACT

Some of the facts and certain exhibits have been stipulated for trial pursuant to Rule 91. The parties' stipulations are incorporated in this Memorandum Opinion by reference and are found accordingly except as noted below.

General Background

Petitioners resided in Providence, Rhode Island, when they filed their petition in the instant case. Petitioners reported their income and deductions for the years in issue on the basis of the cash receipts and disbursements method of accounting.

Beginning in January 1985 and until May 26, 1989, petitioner was employed by Drexel as a stockbroker in its retail securities operation. During petitioner's employment, Drexel and its subsidiaries were engaged in the business of providing investment, banking, securities brokerage, trading, merchant banking, and other financial services. During his employment with Drexel, petitioner was primarily engaged in the trading of corporate bonds for Drexel's individual and corporate clients and was not involved in the high-yield, or "junk bond" underwriting facet of Drexel's business.

Petitioner's Acquisition and Sale of the Shares

During 1985 and 1986, Drexel privately sold its common stock to certain employees and Drexel insiders. By letter dated April 25, 1985, Drexel offered to sell to petitioner, as part of its employee stock purchase plan, 700 shares of its common stock at the December 31, 1984, book value of $67.04 per share. On that date, petitioner acquired the 700 shares for a total purchase price of $46,928. By letter dated April 30, 1986, Drexel offered to sell to petitioner an additional 600 shares of its common stock at the fixed price of $115.96 per share. On that date, petitioner acquired the additional 600 shares for a total purchase price of $69,576. On two occasions after April 1986, petitioner's 1,300 shares of Drexel stock split 2-for-1, giving

petitioner a total of 5,200 shares.[1]  Petitioner's original cost basis in the shares was $116,504.

Petitioner never physically possessed the shares, which were held in "street" name in petitioner's security account with Drexel.  Petitioner's shares were not registered pursuant to the Securities Act of 1933, and there was no market on which they could be traded.  In accordance with the "buy-back provision" contained in Drexel's Restated Certificate of Incorporation (certificate), the shares were nontransferable and generally could only be sold to Drexel upon an employee's termination from Drexel.  Pursuant to the certificate, the price Drexel would pay for the shares was set at their aggregate net book value.

Pursuant to the recommendation of a consultant that its retail securities operation be sold, Drexel announced on or about April 18, 1989, that it was disposing of the operation, of which petitioner was an employee, to Smith Barney Harris Upham, Inc., and the sale occurred on May 19, 1989.  As a consequence of the sale, petitioner's employment with Drexel was terminated, which precipitated the mandatory redemption of the shares pursuant to the terms of the certificate.  Drexel notified petitioner by letter dated August 11, 1989, that pursuant to the "buy-back

---

[1] We accordingly do not accept the suggestion in the parties' stipulation that petitioner owned only 1,300 shares of Drexel stock throughout the period that he held the shares.  Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 185 (1989).

provision" in the certificate, it intended to purchase the shares because of the cessation of his employment with Drexel. The per-share purchase price was set at the adjusted book value on May 26, 1989, which was $45.06. Pursuant to the terms of the certificate, petitioner was entitled to contest Drexel's determination of the book value of the shares.

In August 1989 (effective May 26, 1989), Drexel redeemed the shares in exchange for a cash payment of $67,950 and a subordinated note (note) dated May 26, 1989, in the principal amount of $166,361. The note was nonnegotiable and could not be encumbered or disposed of without the consent of Drexel. The note provided for two principal payments: The first, in the amount of $142,930, was payable on November 26, 1990, and the second, in the amount of $23,431, was payable on May 24, 1994. Interest accrued on the unpaid principal balance and was payable semiannually on June and December 15. On August 23 and December 19, 1989, Drexel paid petitioner interest on the principal amount of the note pursuant to its terms.

Events Preceding the Bankruptcy of Drexel

In November 1986, the Securities Exchange Commission (SEC) and the U.S. Department of Justice (Justice Department) commenced investigations (investigations) of alleged violations of the Securities Exchange Act by Ivan Boesky and Drexel insiders and/or employees.

As a result of the investigations, in December 1988, the SEC commenced a civil action against Drexel, members of its High Yield Bond Department, and other related persons alleging that those persons engaged in fraudulent conduct with respect to various securities transactions. Subsequently, the Justice Department informed Drexel that it intended to seek an indictment against Drexel unless Drexel agreed to settle the proposed charges. During that time, Drexel made frequent disclosures to its employees regarding the potential criminal charges, denying that it was guilty of any wrongdoing.

In December 1988, as a result of the investigations and potential indictment, Drexel agreed to pay $650 million in fines and restitution, $350 million of which was to provide a civil disgorgement fund to be distributed in accordance with a court-approved plan.

In January 1989, Drexel entered into a formal plea agreement with the Justice Department, agreeing to plead guilty to six criminal charges. Thereafter, during April 1989, Michael Milken, head of Drexel's High Yield Bond Department, was indicted on 98 counts of securities fraud and related charges. Mr. Milken resigned all positions that he held with Drexel on June 15, 1989. In September 1989, Drexel paid $500 million of the fines and restitution.

The investigations and related negative publicity, market developments, and the cost associated with the sale of its retail

securities operation had a negative effect on Drexel's financial position during 1989. Drexel, however, continued to engage in business throughout 1989 and into 1990. Drexel responded to the difficulties facing it by (1) increasing efforts to reduce its securities positions, especially in high-yield securities and bridge loans, (2) pursuing alternative sources of financing, and (3) developing and considering different strategic options for its lines of business. Drexel developed a 1990 business plan that projected significant cuts in operating costs, which were in addition to a large reduction of expenses in 1989 from 1988 levels. Drexel also completed a series of management changes that were designed to provide new leadership in key business areas. Despite the adverse developments affecting Drexel, it projected a profit for 1990.

During January 1990, Drexel's cash flow from operations was depressed, and Drexel experienced continuing difficulties in financing its operations, relying upon the assets of subsidiaries to fund shortfalls. Drexel also sought new sources of financing to replace its commercial paper, which was unattractive to buyers because of a lowered rating. Although Drexel believed that it could utilize the excess net regulatory capital of its subsidiaries to finance its operations, it was informed by the SEC on February 7, 1990, that it could not borrow any of the subsidiaries' funds without prior SEC approval. Although the SEC agreed to permit Drexel to borrow funds from a subsidiary to pay

off commercial paper maturing on February 12, 1990, word of Drexel's liquidity problem spread through the market, and some entities refused to trade with Drexel.

Drexel's Bankruptcy Proceedings

On February 13, 1990, Drexel was advised by the SEC and the Federal Reserve Bank of New York to file a petition pursuant to Chapter 11 of the Bankruptcy Code (chapter 11). Drexel's board of directors agreed to commence a chapter 11 case and, on that date, Drexel filed a voluntary petition for relief pursuant to chapter 11 in the U.S. Bankruptcy Court for the Southern District of New York (bankruptcy court).

Beginning on the date of the bankruptcy filing, Drexel began to wind down certain of its affairs and operations and significantly reduced its operating expenses. After the petition was filed, Drexel began to consider alternatives for the ultimate resolution of its chapter 11 case. Financial projections for Drexel and its subsidiaries were prepared, including sales values for assets and an analysis of liabilities. The problems presented by (1) growing litigation against Drexel, including many suits pursuant to the securities laws, (2) the need to resolve that litigation, (3) potential claims against Drexel by the Internal Revenue Service (IRS), and (4) the difficulty of quickly disposing of many of Drexel's assets at amounts near their book value weighed against liquidation of Drexel and indicated the need for a reorganization of Drexel and an entity

to manage Drexel's assets.  During April 1990, a committee of Drexel's creditors began an examination of Drexel with a view to establishing bases for possible asset and claim recoveries.

The bankruptcy court set a deadline of November 15, 1990, for filing proofs of claim against Drexel, but allowed the IRS until February 13, 1991, to file its proof of claim on account of all Federal income and other taxes allegedly owed by Drexel and its subsidiaries.  During 1991, a settlement agreement was reached between Drexel, its subsidiaries, and the IRS with respect to the IRS' Federal tax claims.  Also during 1991, Drexel reached a settlement with respect to the securities litigation claims made against it.

Petitioner filed a timely proof of claim against Drexel's bankruptcy estate.  Petitioner's claim was based on, and was equal to, the full face amount of the note.  Petitioner and other former Drexel employees who had received notes in redemption of Drexel shares were represented in the bankruptcy proceeding by a committee known as the Equity Committee.  During 1990, petitioner was informed by the Equity Committee that Drexel might have committed technical violations of the Employee Retirement Income Security Act (ERISA) with respect to the shares and the note.  A claim pursuant to ERISA was made against Drexel's bankruptcy estate in connection with the subordinated notes held by petitioner and approximately 1,000 others, and, after negotiations, the claims filed by petitioner and other former

Drexel employees similarly situated were treated as ERISA claims. As a result, the priority of the claims of petitioner and other former Drexel employees against Drexel's bankruptcy estate was elevated.

Drexel's plan of reorganization (plan) assigned petitioner and other former Drexel employees to DBL Group Class 6B. Pursuant to the plan, members of that class were to receive marketable securities known as certificates of beneficial interest (CBI's) in the DBL Liquidating Trust (trust) and limited partnership interests known as DPI-A's. The distributions to be made to members of Group Class 6B were based on the face amount of each noteholder's note. In exchange for the distributions, members of the class were to release their ERISA claims. Petitioner voted to approve the plan.

On April 30, 1992, the plan was confirmed by the bankruptcy court. Pursuant to the plan, on that date, petitioner received certain CBI's and DPI-A's, all of which were valued at $8,455.54. On September 30, 1993, petitioner received certain additional CBI's and a DPI-A, all of which were valued at $2,089.69. Pursuant to a closing agreement between Drexel and the IRS, the distributions were treated as wage income for withholding and information reporting purposes. A letter dated August 29, 1992, sent to petitioner by the trust stated:

> Pursuant to the order of the Bankruptcy Court confirming the plan, holders of securities issued under the plan are required to take positions on their tax

returns consistent with the tax information provided by the Trust and the other plan entities in accordance with the Closing Agreement between Drexel and the Internal Revenue Service.

Petitioner was issued Forms W-2 reporting the 1992 and 1993 distributions as wages. Petitioners reported the distributions as ordinary income on, respectively, their 1992 and 1993 Federal income tax returns.

Petitioners' 1989 and 1990 Federal Income Tax Returns

Petitioners' 1989 and 1990 Federal income tax returns were prepared by a return preparer.

On their 1989 return, petitioners reported a long-term capital gain with respect to the sale of the shares in the amount of $22,950, claiming an amount realized on the sale of $67,950 and a basis of $45,000. Petitioners did not mention the note on the return. Because petitioner did not have adequate records with respect to the shares, he incorrectly estimated the basis claimed on the return. Petitioners did not elect to report the sale of the shares on the installment method on their 1989 return.

On their 1990 Federal income tax return, petitioners reported a long-term capital loss with respect to the note in the amount of $29,945, claiming an amount realized of $166,361 and a basis of $196,306.

On April 14, 1993, petitioners mailed to the IRS an amended 1989 Federal income tax return reporting a capital loss with

respect to the sale of the shares by increasing the basis claimed for the shares from $45,000 to $116,528. Petitioners subsequently filed an amendment to the amended return claiming a basis of $116,504 for the shares.

## OPINION

The first issue we must decide is whether petitioners, for taxable year 1989, must recognize a capital gain[2] pursuant to the installment sale provisions of section 453 on the disposition of the shares. As a general matter, an installment sale is a disposition of property where one payment is to be received after the close of the year in which the disposition occurs. Sec. 453(b)(1).[3] Income from an installment sale is to be taken into account using the installment method, unless a taxpayer elects not to have the method apply. Sec. 453(a), (d). The installment method requires gain from the disposition to be recognized for payments received in a taxable year in the same proportion that the gross profit (realized or to be realized when payment is completed) bears to the total contract price. Sec. 453(c).

---

[2]

Respondent does not contest petitioners' characterization of their gain as capital gain.

[3]

Sec. 453(b)(1) provides:

(1) In general.--The term "installment sale" means a disposition of property where at least 1 payment is to be received after the close of the taxable year in which the disposition occurs.

Generally, the election not to report a disposition of property on the installment method is made by the due date of the taxpayer's return for the year in which the disposition occurs and in the manner prescribed by the appropriate tax forms for that return.  Sec. 15A.453-1(d)(3), Temporary Income Tax Regs., 46 Fed. Reg. 10718 (Feb. 4, 1981); see also Bolton v. Commissioner, 92 T.C. 303, 305-306 (1989).

Respondent contends that petitioner's disposition of the shares falls squarely within the definition of an installment sale, and, therefore, petitioners must report gain pursuant to the installment method on the disposition of the shares for the year of the sale, to wit, 1989.  Petitioners contend that the sale was not an installment sale because no payment was to be received after the close of the year in which the disposition of the shares occurred, as required by section 453(b)(1).  Petitioners contend that the note was not a "payment" as that term is used in section 453(b)(1), because section 453(f)(3)[4] excludes from the definition of "payment" the receipt of an evidence of indebtedness of the person acquiring the property unless the purchaser's evidence of indebtedness is payable on

---

[4]

Sec. 453(f)(3) states:

(3) Payment.--Except as provided in paragraph (4), the term "payment" does not include the receipt of evidences of indebtedness of the person acquiring the property (whether or not payment of such indebtedness is guaranteed by another person).

demand or is issued by, inter alia, a corporation and is readily tradable, sec. 453(f)(4),[5] and the note was neither payable on demand nor readily tradable.  Petitioners argue that the only "payment" received with respect to the shares was the cash that they received from Drexel during 1989.  Accordingly, petitioners argue that they were not required to elect out[6] of the installment method in order to preclude its application to petitioner's disposition of the shares.

Although petitioners are correct in their contention that the note was not a "payment" within the meaning of the relevant sections because it was neither payable on demand nor readily tradable, petitioners simply misinterpret the Code when they conclude that the transaction was not an installment sale because the note was not a "payment".  By excluding the receipt of a nondemand, nonreadily tradable evidence of indebtedness from the definition of "payment", the installment sale provisions treat

---

[5]

Sec. 453(f)(4) states:

> (4) Purchaser evidences of indebtedness payable on demand or readily tradable.--Receipt of a bond or other evidence of indebtedness which--
>      (A) is payable on demand, or
>      (B) is issued by a corporation or a government or political subdivision thereof and is readily tradable,
> shall be treated as receipt of payment.

[6]

Petitioners do not argue that they elected out of the installment method as provided by sec. 453(d).

the actual payments made in satisfaction of such an obligation as "payments" when made. Consequently, because the note provided for payments to be made after the close of 1989, the taxable year during which the disposition of the shares occurred, the transaction is an "installment sale" within the meaning of section 453(b)(1).

Petitioners argue that the note became worthless during 1989 and for that reason the installment sale provisions of section 453 do not apply. Petitioners, however, have not shown that the note became worthless during 1989.[7]

The worthlessness of a debt is a question of fact. Crown v. Commissioner, 77 T.C. 582, 598 (1981). A debt is considered worthless when there are reasonable grounds for abandoning any hope that the debt will be paid in the future. Estate of Mann v. United States, 731 F.2d 267, 276 (5th Cir. 1984). Although a taxpayer is not required to be an "incorrigible optimist" with respect to the collection of debts owed to him, United States v. S.S. White Dental Manufacturing Co., 274 U.S. 398, 403 (1927), neither must a taxpayer be a "stygian pessimist", Riss v.

---

[7] We also are not persuaded by petitioners' contention that requiring them to report the sale of the shares on the installment method causes them to recognize income for taxable year 1989 when the sale actually produced a loss. As we discuss below, to the extent they suffer an allowable loss, petitioners may avail themselves of the provisions of sec. 166 in the year that the note becomes worthless. American Offshore, Inc. v. Commissioner, 97 T.C. 579, 592-597 (1991).

Commissioner, 478 F.2d 1160, 1166 (8th Cir. 1973), affg. on this issue and remanding on another issue 56 T.C. 388 (1971). "The decision must be made in the exercise of sound business judgment, based upon as complete information as is reasonably obtainable." Andrew v. Commissioner, 54 T.C. 239, 248 (1970) (citing Blair v. Commissioner, 91 F.2d 992, 994 (2d Cir. 1937)). Generally, the taxpayer must show one or more "identifiable events" that demonstrate the worthlessness of the debt. American Offshore, Inc. v. Commissioner, 97 T.C. 579, 593 (1991).

If the debtor is solvent in the sense that its assets exceed its liabilities, ordinarily no bad debt deduction is allowable to the creditor. Perry v. Commissioner, 22 T.C. 968, 973-975 (1954); Bennett v. Commissioner, 20 B.T.A. 171, 173-174 (1930). Although evidence demonstrating that the debtor is insolvent points to the conclusion that the debt is worthless, see Gorman Lumber Sales Co. v. Commissioner, 12 T.C. 1184, 1192 (1949), insolvency is not conclusive evidence that a debt is worthless. Cimarron Trust Estate v. Commissioner, 59 T.C. 195, 200 (1972). The fact that the credit of a debtor is not good, and that it does not have sufficient cash or other quick assets to pay its debts immediately, does not necessarily make a debt worthless. Bennett v. Commissioner, supra at 173-174; Ernst v. Commissioner, 18 B.T.A. 928, 929 (1930). Even if a debtor is shown to be insolvent, if it is still actively engaged in business, its insolvency does not necessarily establish the worthlessness of

the debt.  <u>Trinco Indus., Inc. v. Commissioner</u>, 22 T.C. 959, 965 (1954).  Consideration must be given to the debtor's potential for improving its financial position.  <u>Dustin v. Commissioner</u>, 53 T.C. 491, 502 (1969), affd. 467 F.2d 47 (9th Cir. 1972).

The mere belief of the creditor that the debtor is in bad financial condition is not adequate evidence that the debt is worthless.  <u>Bryan v. Commissioner</u>, 32 T.C. 104, 131 (1959), affd. in part and remanded on another issue 281 F.2d 238 (4th Cir. 1960).  Moreover, the subjective, good faith opinion of the taxpayer that the debt is uncollectible, standing alone, is not sufficient evidence that the debt is worthless.  <u>Fox v. Commissioner</u>, 50 T.C. 813, 822 (1968), affd. per curiam by an unreported order (9th Cir. March 9, 1970).

Applying the foregoing cases, we hold that the record in the instant case fails to establish that the note was worthless during 1989.  Several considerations support our conclusion.  We begin with the fact that Drexel continued to engage in business throughout 1989 and into 1990.  Petitioner admitted at trial that, based on its continued operations, Drexel seemed viable as a going concern.  Drexel's continued business operations through and beyond 1989, even though it may have been faltering, indicate that the note did not become worthless during 1989.  <u>Riss v. Commissioner</u>, 56 T.C. at 408.  Where a financially troubled company remains actively engaged in business, the potential ability to pay some of its debts may exist.  <u>Pierson v.</u>

Commissioner, 27 T.C. 330, 339 (1956), affd. 253 F.2d 928 (3d Cir. 1958).

We also consider the fact that Drexel was current on its interest obligations throughout 1989. On August 23 and December 19, 1989, Drexel made interest payments on the note, a factor that weighs against worthlessness. Cole v. Commissioner, 871 F.2d 64, 67 (7th Cir. 1989), affg. T.C. Memo. 1987-228.

Additionally, we consider the fact that the record is devoid of any direct evidence of the worthlessness of the note. Although petitioner testified at trial that he observed certain events which he believed "could have impaired Drexel's capital or its ability to do business", such as the resignation of Michael Milken during June 1989, Drexel's payment of $500 million in fines and restitution during September 1989, and a 216-point drop in the Dow Jones Industrial Average on October 13, 1989, petitioner's negative perceptions of Drexel's condition, without more, are inadequate to support a finding of worthlessness. Fox v. Commissioner, supra at 822. Moreover, general unfavorable circumstances have less to do with establishing worthlessness than specific facts regarding the debtor's assets and the amount and validity of claims against it. Dallmeyer v. Commissioner, 14 T.C. 1282, 1292-1293 (1950).

Petitioners argue that Drexel itself viewed the note as worthless. Petitioners rely on the fact that the notation "N/A" appears beneath the words "Market Value" in monthly statements

dated September and December 29, 1989, as evidence of Drexel's affirmation that the note was worthless.  Respondent contends that the notation does not establish worthlessness because there is no conclusive evidence of its meaning.  Respondent posits that the notation might simply have meant that the market value was "not available" because the note was not marketable.  We agree. Petitioners did not offer the testimony of a Drexel employee or other credible evidence as to the meaning of the notation. Consequently, we do not find the notation to be persuasive evidence that the note was worthless.

Petitioners also contend that Drexel's insolvency during 1989 is shown by the allegations of Drexel's insolvency made in a complaint filed in a 1992 defendant class action by Drexel against its employees for recovery of alleged preferential and/or fraudulent transfers.  However, that complaint was admitted into evidence, subject to respondent's objection to its relevance, solely for the purpose of showing that the complaint was filed, not for the purpose of allowing the hearsay statements made in the complaint to be admitted for the truth of the matters asserted in the complaint.  Consequently, we do not find that it has any bearing on the question of the worthlessness of the note.[8]

---

[8] We accordingly sustain respondent's relevance objection.

Petitioners' brief makes the following statement about Drexel's financial condition on December 31, 1989:  "Drexel's true financial condition as of December 31 was -- and still is -- anyone's guess."  However, worthlessness is determined on the basis of objective standards, Dustin v. Commissioner, 53 T.C. at 501, and a guess as to the debtor's financial condition does not establish reasonable grounds for abandoning any hope that the debt will be paid in the future.  See Estate of Mann v. United States, 731 F.2d at 276.  Petitioners cannot satisfy their burden of proof by simply showing that petitioner had a good faith subjective belief that the note was worthless.  Fox v. Commissioner, supra at 822.  We accordingly sustain respondent's determination for petitioners' 1989 taxable year.[9]

Petitioners alternatively argue that the note became worthless during 1990 and that they are therefore entitled to a bad debt deduction pursuant to section 166 for that year. Petitioners argue that Drexel's filing for protection pursuant to chapter 11 on February 13, 1990, was the "single identifiable event" upon which the determination of the worthlessness of the note should be made.  Petitioners argue that the size of the

---

[9]
Respondent determined the 1989 deficiency in petitioners' Federal income tax using a basis for the shares of $116,528, which was also the amount claimed in petitioners' initial amended return for 1989.  Respondent, however, does not seek to modify that determination to take account of the basis of $116,504 for the shares as reflected in a later amendment to the return.

claims made against Drexel in relation to its assets shows that there was no hope that the note would be paid.

As respondent points out, however, a debtor's petition in bankruptcy is not conclusive of a debt's total worthlessness. Estate of Mann v. United States, supra at 276; Dallmeyer v. Commissioner, supra at 1292-1293; sec. 1.166-2(c), Income Tax Regs. The debtor may have assets remaining that will permit some amount to be paid to creditors. Patten & Davies Lumber Co. v. Commissioner, 45 F.2d 556, 558 (9th Cir. 1930), revg. a Memorandum Opinion of this Court dated July 29, 1929. The question whether any of Drexel's assets would be available to pay the note depends upon the value of Drexel's assets, the amount and validity of secured and priority claims filed, and the cost of the bankruptcy administration, and not solely on Drexel's financial history which ultimately led to its bankruptcy petition. Dallmeyer v. Commissioner, supra at 1292-1293; see also Patten & Davies Lumber Co. v. Commissioner, supra at 558.

Petitioners have failed to show the value of Drexel's assets, the amount and validity of secured and priority claims filed, and the cost of the bankruptcy administration. Indeed, the record indicates to us that those factors could not be determined with any degree of certainty during 1990. Such uncertainty precludes a conclusion that the note became worthless in that year. Dallmeyer v. Commissioner, supra at 1293. During 1990, the process of making and evaluating claims against Drexel

was ongoing, and the final deadline for claims was extended until the following year so that the IRS could file its proof of claim. Many of the claims against Drexel arose from securities litigation, and the amount of Drexel's liability in connection with those claims could not be known until the litigation was settled or proceeded to judgment. Contrary to petitioners' contention, the size of the claims made against Drexel are not necessarily probative of the state of its financial condition in 1990. For instance, we note that the IRS filed a Federal tax claim against Drexel in the amount of $5.3 billion, which apparently was settled for, inter alia, a payment of $183 million in 1992 and a payment of $106 million in interest over the next 6 years. Finally, Drexel filed a petition for reorganization pursuant to chapter 11, which, absent evidence that the creditors have suggested dismissal, often carries a strong presumption that the reorganization was not hopeless. Mayer Tank Manufacturing Co. v. Commissioner, 126 F.2d 588, 592 (2d Cir. 1942); see Simon v. Commissioner, T.C. Memo. 1978-485. The record in the instant case indicates to us that the events that occurred in 1990 do not require a conclusion that all reasonable hope that the note would be paid, at least in part, could be abandoned in that year. Estate of Mann v. United States, supra at 276.

Petitioner's subjective perceptions of Drexel's financial condition on February 13, 1990, are insufficient to support petitioners' claim that the note became worthless during 1990.

Fox v. Commissioner, 50 T.C. at 822. We have considered petitioners' remaining arguments and find them to be without merit. Accordingly, we hold that petitioners have failed to prove that the note became worthless during 1990.

The final issue we consider is whether petitioners are liable for the accuracy-related penalty provided by section 6662(a). Section 6662(a) imposes a 20-percent penalty on the portion of an underpayment of tax that is attributable to, inter alia, negligence or disregard of rules or regulations. The term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Code, including failure to exercise due care, failure to do what a reasonable person would do under the circumstances, or failure to keep adequate books and records. Sec. 6662(a); sec. 1.6662-3(b)(1), Income Tax Regs. The term "disregard" includes any careless, reckless, or intentional disregard of the Code or the temporary and final regulations issued pursuant to the Code. Sec. 6662(c); sec. 1.6662-3(b)(2), Income Tax Regs.

The accuracy-related penalty does not apply to any portion of an underpayment with respect to which it is shown that there was a reasonable cause and that the taxpayer acted in good faith. Sec. 6664(c)(1). The decision as to whether the taxpayer acted with reasonable cause and in good faith depends upon all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Generally, the most important factor is the extent of

the taxpayer's efforts to assess the proper tax liability. Id. An honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the knowledge and experience of the taxpayer, may also indicate reasonable cause and good faith. Id. Petitioners must establish error in respondent's determination that they are liable for the penalty provided by section 6662(a). Rule 142(a); Estate of Monroe v. Commissioner, 104 T.C. 352, 366 (1995).

We conclude, however, that petitioners are liable for the penalty. Although petitioners employed a tax return preparer to complete the return, they admit that they did not give complete information to the preparer concerning the sale of the shares and acknowledge their responsibility for the errors in the return. In reporting the sale on their 1989 return, petitioners included only the cash received, $67,950, and claimed a basis of $45,000, which petitioner admitted at trial was incorrect. Petitioners also admit that they did not correctly report the basis of the shares because petitioner did not have adequate records. Petitioner testified that he considered the basis claimed on the return to be the basis in the first group of shares that he had purchased in 1985. Petitioner thus apparently reported the sale of the shares as involving only a portion of the shares, even though all 5,200 of the shares were redeemed by Drexel in 1989. Petitioners contend that they eventually were able to correct the erroneous basis claim in their 1989 return by filing an amended

return in 1993, but petitioners concede that the amended return was not filed until after respondent issued the statutory notice determining the deficiencies in the instant case.

Furthermore, petitioners did not properly elect out of the installment method for purposes of reporting the sale of the shares, nor did they properly report the sale on that method. Petitioners claim that petitioner made a good faith effort to ascertain the worthlessness of the note and that his effort should be sufficient to show that he was not negligent. However, petitioner's conclusion as to the worthlessness of the note was based on little other than his subjective opinion, which is insufficient to sustain a deduction. Fox v. Commissioner, 50 T.C. at 822.

On Schedule D of their 1990 return, petitioners reported a long-term capital loss with respect to the note in the amount of $29,945, calculated by subtracting the face amount of the note, $166,361, from a basis of $196,306. Petitioners' basis in the shares was only $116,504. Petitioners have not attempted to explain how they established the claimed basis in the note or to otherwise justify the amount and nature[10] of the loss claimed.

---

[10] Petitioners argue that the note became worthless during 1990; however, the Code provides for the treatment of a worthless debt as a deduction, sec. 166(a), or, in the case of a nonbusiness bad debt, as a short-term capital loss, sec. 166(d). Petitioners have not attempted to reconcile their argument with the position taken on their 1990 return.

Based on the foregoing, we sustain respondent's determination that petitioners are liable for the penalty provided by section 6662(a).

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.