LAKEWOOD HOSPITAL ASSOCIATION, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lakewood Hospital Asso. v. Commissioner
Docket No. 10659-76.
United States Tax Court
T.C. Memo 1979-107; 1979 Tax Ct. Memo LEXIS 418; 38 T.C.M. (CCH) 499; T.C.M. (RIA) 79107; March 26, 1979, Filed *418 Held: petitioner correctly deducted amounts as business bad debt under sec. 166(a)(1). Arthur Shapiro and Nelson E. Genshaft, for the petitioner. Donald W. Mosser, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent determined deficiencies in income taxes paid by petitioner for the following taxable years and in the following amounts: Taxable Year Ended
Deficiency
December 31, 1971
$53,812
December 31, 1972
50,379
Due to concessions by petitioner, the only issue for our decision is the allowability to petitioner of a deduction claimed by it for its taxable year ended December 31, 1971. The alleged deficiency for petitioner's taxable year ended December 31, 1972 is based on respondent's disallowance of a net operating loss carryover from 1971. Since the full amount of 1971's net operating loss is due to the deduction at issue, resolution of petitioner's 1972 claim will follow from our decision with respect to 1971. [1]
*420 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and supplemental stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner, Lakewood Hospital Association, Inc., was organized on September 4, 1958 as a business corporation under the laws of the state of Washington. Petitioner has at all times used a cash basis of accounting. Its principal office is located in Columbus, Ohio. Petitioner's amended returns for its taxable years ended December 31, 1971 and 1972 were filed on December 17, 1973 with the district director of internal revenue at Seattle, Washington. Petitioner is in the business of leasing. Its sole activity during the years in issue was leasing a hospital, including the land, buildings, and all necessary equipment to run the hospital, to Lakewood General Hospital and Convalescent Center (Hospital), a non-profit corporation organized on March 24, 1961 under the laws of the state of Washington. Hospital was granted exemption from tax under section 501(c)(3) in 1964. Through the end of calendar year 1967 petitioner made cash advances to, or for *421 the use of, Hospital in the principal amount of $491,856.61. Sometime during 1968 petitioner deferred demand for repayment of these pre-1968 advances indefinitely. As of December 31, 1966 Hospital owed petitioner $446,948 in unpaid back rental payments under its lease with petitioner. Sometime prior to 1969, petitioner indefinitely deferred demand for payment of this amount until sufficient funds had been accumulated by Hospital to enable it to pay these arrearages. The determination of when Hospital had accumulated sufficient funds to make the payment was left to the discretion of Hospital's board of governors. Sometime in 1968 petitioner, in an effort to improve Hospital's balance sheet, subordinated its claim for these pre-1967 rent arrearages to all Hospital's other creditors. Both the deferred cash advances and deferred rental payments were shown on petitioner's balance sheet for its fiscal year ended December 31, 1968 as non-current receivables. Pursuant to a purchase agreement dated July 24, 1969, Monterey Life Systems, Inc. (Monterey), a Delaware corporation with its principal office located in Columbus, Ohio, acquired 50.8 percent of petitioner's outstanding shares *422 of common stock. In the stock purchase agreement the sellers represented and warranted that petitioner's accounts receivable, including the above described arrearages, had arisen in the ordinary and regular course of petitioner's business and were valid and collectible accounts receivable in accordance with the terms of the contracts giving rise to the receivables. Before entering into this purchase agreement Monterey's management carefully reviewed the financial statements of both petitioner and Hospital. The receivables owed petitioner by Hospital were analyzed and the conclusion reached that they were viable debts. Monterey's faith in petitioner's future was in large part due to Monterey's high regard for the income potential of the Convalescent Center (Center), a convalescent home being constructed adjacent to Hospital by LAS, Inc., a 100 percent subsidiary of Monterey. Center was built with the expectation that it would be leased to, and it was subsequently leased to, Hospital. Both Monterey and petitioner expected that Center's close proximity to Hospital would greatly enhance Hospital's efficiency and be a source of patient revenue. It was envisioned that Hospital *423 and Center would each complement the other financially and medically. A condition precedent to Center's financial success and success of its envisioned symbiosis with Hospital was, however, Center's ability to qualify all of its 130 beds as "skilled care beds" under state law. "Skilled care bed" classification for all Center's beds would have entitled Hospital to complete cost reimbursement from Medicare for all Hospital's cost of starting up and running Center. Monterey was, at that time, rapidly expanding its holdings in the health care field. Its management was experienced in administering health care facilities. Monterey believed that, in large part, the financial problems which had given rise to Hospital's large debts to petitioner were due to bad management. Monterey hoped that it would eventually be able to appropriate to itself the management of Hospital, thereby reversing Hospital's financial woes and providing for itself a lucrative management contract. Monterey's management was of the opinion that it was possible to reverse the financial problems of a health care facility like Hospital within 90 days--given proper management. Hospital began operating Center in *424 February of 1970. Hospital leased all the physical plant necessary to run Center, including land, buildings, and equipment, from LAS, Inc. But instead of licensing all of Center's beds as "skilled care beds", as was hoped, Washington state allowed only 25 of Center's bed that status. The remaining 105 beds were treated as intermediate care or nursing home beds and did not qualify for complete cost reimbursement under Medicare. Petitioner continually attempted to have these 105 beds reclassified by the state of Washington, but was never successful. Subsequently, only 50 of these beds were used for intermediate care services and the area in which the remaining beds had been located was turned into office space. As a result of this failure to get skilled bed classification, Center was far from being the source of income and efficiency Hospital had hoped. Further, neither petitioner nor Monterey were able to obtain the hoped for management contract. Hospital's performance, which had always been disappointing, continued to be sluggish. See Chart on page 8. As the chart contained on page 8 shows, although Hospital itself slowly began to make money, its overall operation still *425 continued to lose money. Starting in 1969 Hospital again began to fall behind in its lease payments to petitioner, despite the fact that payment of the $446,948 owing through the end of 1967 had been deferred and subordinated. The following chart shows the undeferred and unpaid lease payments owing petitioner as of the dates shown: Date
Rental Arrearages
December 31, 1969
$ 58,547
December 31, 1970
153,000
June 30, 1971
116,000
June 30, 1972
167,000
LAKEWOOD GENERAL HOSPITAL AND CONVALESCENT CENTER SUMMARY OF EARNINGS (IN THOUSANDS) FOR THE FOUR YEARS ENDED DECEMBER 31, 1972 1969
1970
CONVALESCENT
CONVALESCENT
HOSPITAL
CENTER
HOSPITAL
CENTER
(See Note
below)
Gress Revenue
$2,718
$2,938
$ 295
Deluctions - Provision for
doubtful accounts and
contractual adjustments
75
146
(12)
Net Revenue
2,643
2,792
307
Other Revenue
33
12
20
Total Revenue
2,676
2,804
327
Operating Expenses
2,670
2,815
542
Net Income (Loss)
$ 6
$ (11)
$ (215)
Combined Net Income (Loss)
$
6
(226)
Cumulative Net Income
(Loss) - Convalescent
Center
$0
$ (215)
Cumulative Net Income
(Loss) - Hospital
$ 6
$ (5)
Cumulative Net Income
$
6
(220)
(Loss)
*426 1971
1972
CONVALESCENT
CONVALESCENT
HOSPITAL
CENTER
HOSPITAL
CENTER
(See Note
below)
Gress Revenue
$3,558
$ 578
$3,633
$ 676
Deluctions - Provision for
doubtful accounts and
contractual adjustments
259
78
177
71
Net Revenue
3,299
500
3,456
605
Other Revenue
25
0
22
2
Total Revenue
3,324
500
3,478
607
Operating Expenses
3,155
649
3,435
872
Net Income (Loss)
$ 169
$ (149)
$ 43
$ (265)
Combined Net Income (Loss)
20
(223)
Cumulative Net Income
(Loss) - Convalescent
Center
$ (364)
$ (629)
Cumulative Net Income
(Loss) - Hospital
$ 164
$ 207
Cumulative Net Income
(200)
(422)
(Loss)
NOTE: Convalescent Center did not begin operations until February 1970. As the debts of Hospital and Center mounted, the morale of Hospital's staff fell. Petitioner found itself being blamed for Hospital's financial woes even though it had by 1970 deferred about $1 million in debts owing it. Petitioner, whose sole source of income is Hospital, began to fear that Hospital's financial plight and low morale would cause physicians to take their patients elsewhere. Where this to happen both *427 Hospital and petitioner would fail. Sometime prior to June 16, 1971, petitioner was contacted by Leslie M. Potter (Potter), Hospital's manager, with respect to Hospital's financial plight.Potter believed that Hospital needed to "clean up" its balance sheet for credit purposes. Since the rental charges owing petitioner for years prior to 1967 had been both deferred and subordinated, only the debts owing petitioner with respect to its unrepaid cash advances could affect Hospital's credit. Potter asked that this latter debt be forgiven. Petitioner's board of trustees met on June 16, 1971 to consider the matter. At this meeting it was concluded that there was no hope in the foreseeable future that Hospital would be able to repay these cash advances. Authorization to forgive the debt was granted. As a result petitioner deducted $519,759 for its taxable year ended 1971, including $27,902.39 of "accrued" interest. Respondent disallowed this entire deduction. Since petitioner was at all times on a cash basis, it has conceded the nondeductibility of the interest item leaving $491,856.61 in issue. [2]
*428 OPINION The question which we must decide is whether petitioner Lakewood Hospital Association, Inc. is entitled to a deduction in 1971 in the amount of $491,856.61. Petitioner claims that it should be allowed this amount as a bad debt under section 166(a)(1) or, alternatively, as a business expense or business loss under sections 162 or 165, respectively. As an alternative to deducting the loss in 1971, petitioner argues that the debt is properly deductible as worthless in 1969 or 1970, pursuant to section 166. Respondent's position is that the evidence does not establish the worthlessness of the debt generated by the cash advances at the end of any of the calendar years 1969, 1970 or 1971, or, alternatively, that the evidence does not establish that the debts had any value at the beginning of such years. Rather, claims respondent, the evidence tends to show that the subject debt had a greater potential value toward the end of those years then at the beginning of 1969. We believe that the advances became wholly worthless during 1971 and are therefore deductible by petitioner under section 166 [3] during that taxable year. *429 Respondent has not questioned the bona fides of the debt created between Hospital and petitioner by petitioner's cash advances. Nor has he questioned that the debt was actually forgiven and written off by petitioner in 1971, or that petitioner thereby put beyond itself the right to claim repayment of these advances. Respondent has also not challenged petitioner's claim to a basis in the debt equal to the deduction in issue. We believe that any challenge to these premises would have been unavailing. Rather, respondent has focused on the purely factual question of whether petitioner has shown that it actually sustained the loss during one of the taxable years before us. The question of whether a debt is worthless in a given year is a question of fact. Hawkins v. Commissioner,20 T.C. 1069, 1074 (1953). The burden of proof with respect to the worthlessness of Hospital's debt is on petitioner. Perry v. Commissioner,22 T.C. 968, 973 (1954), Rule 142, Tax Court Rules of Practice and Procedure. To satisfy this burden petitioner must show that the debt had value at the end of 1970 and that it had no value and was completely worthless at the end *430 of 1971. While the burden of proving a debt's worthlessness cannot be satisfied by the unsupported opinion to that effect by a creditor, Fox v. Commissioner,50 T.C. 813, 822 (1968), affd. per curiam in an unreported order (9th Cir. 1970, 25 AFTR 2d 70-891, 70-1 USTC par. 9373), the exercise of sound business judgment by petitioner is a factor which must be considered in determining the appropriateness of its deduction. Portland Manufacturing Company v. Commissioner,56 T.C. 58, 73 (1971), affd. without published decision (9th Cir. 1975, 35 AFTR 2d 25-666, 75-1 USTC par 9449); Minneapolis, St. Paul & Sault Ste. Marie Railroad Company v. United States,164 Ct. Cl. 226, 240-242 (1964), Fox v. Commissioner,50 T.C. at 822. A debt is worthless if it lacks potential value as well as current liquid value. Dustin v. Commissioner,53 T.C. 491, 501 (1969), affd. 467 F.2d 47 (9th Cir. 1972). We believe that the debt generated by the cash advances was not worthless as of January 1, 1970. Monterey had bought petitioner in mid-1969. At that time it believed in the *431 potential future value of both the cash advance and back rental debts. Monterey was of the opinion that, with proper management, Hospital could be turned around within 90 days and that Center could greatly enhance Hospital's efficiency and profitability. Since Center was not opened until February of 1970, there could have been no reasonable determination made with respect to the worthlessness of the advances before 1970. On the other hand, by mid-1971 petitioner had had a chance to evaluate Center's impact on Hospital. By that time it was clear that Center would never receive skilled care bed status for any more of its beds than had already been licensed as such by the state, i.e., 25 out of 130 or 19.23 percent of its beds. Neither petitioner nor Monterey had yet been able to capture for itself the management contract for Hospital. Hospital's dismal performance financially was continuing and there were no clear signs that this trend could be reversed in the near future. Hospital had been given authority to delay repayment of its debts to petitioner until it felt in its sole discretion that it had accumulated sufficient capital. No payment had been made on any of the debts *432 in years. From all the facts we believe that the debt was worthless by mid-1971. Thus we conclude that between early 1970 and mid-1971 the debt became worthless. The next question, therefore, is whether or not the debt was worthless as of December 31, 1970. If it was then the debt was deductible in 1970. If it was not then it was deductible in 1971. Worthlessness cannot be determined by an inflexible formula or by slide rule calculations. Rather that determination must be made on the basis of sound business judgment: In making such a determination the taxpayer must follow a rule of reason, avoiding alike the Scyllian role of the "incorrigible optimist" and the Charybdian character of the "stygian pessimist." United States v. S.S. White Dental Mfg. Co.,274 U.S. 398, 403 (1927); Ruppert v. United States,86 Ct. Cl. 396, 403, 22 F. Supp. 428, 431, cert. denied 305 U.S. 630 (1938). To be deductible, a debt need not be proven worthless beyond all peradventure, since a bare hope that something might be recovered in the future constitutes no sound reason for postponing the time for taking a deduction. (Citations omitted.) The taxpayer *433 is not required to postpone his entitlement to a deduction in the expectancy of uncertain future events nor is he called to wait until some turn of the wheel of fortune may bring the debtor into affluence. Minneapolis, St. Paul & Sault Ste. Marie Railroad Company v. United States,supra at 241. We believe that petitioner has followed such a "rule of reason". The first certified audit of the combined operations of Hospital and Center was not available to petitioner until 1971. Potter's call to request that petitioner cancel Hospital's debts engendered detailed discussion among petitioner's board of trustees. It was decided at that time to write off the debt.We do not believe that this decision could have been prudently arrived at before 1971. We believe that the decision to forgive the debt was reasonable under all the circumstances. We see no need to substitute our judgment for those on the scene. Having once forgiven the debt petitioner could not reasonably be expected to wait for future events to determine whether it should deduct this bad debt in 1971. Had petitioner deducted the loss in 1972, for example, respondent might well be before us arguing *434 that 1971 was the correct year because that was the year in which the debt was forgiven. Petitioner's deduction of its loss in 1971 under section 166(a)(1) was, therefore, correct. Having found for petitioner on the basis of its argument under section 166, we do not reach its alternative arguments under sections 162 or 165.
Decision will be entered under Rule 155. Footnotes
1. In 1971 petitioner, who has always been on a calendar year basis, attempted to change its tax accounting period without first obtaining permission from the secretary. On December 26, 1972 it filed a return for the short period January 1, 1971 to June 30, 1971. Also on December 26, 1972 petitioner filed a Form 1120 for the period July 1, 1971 through June 30, 1972. On December 17, 1973 petitioner filed an amended return, Form 1120, for each of its taxable years ended December 31, 1971 and 1972. Petitioner has conceded the correctness of respondent's adjustments to its income for its taxable years ended December 31, 1971 and 1972, based on this attempted accounting change, in the amounts of $16,525 and $26,251, respectively.↩
2. Petitioner forgave the deferred back rental payments in the amount of $446,948, in 1973. At that time a total of $483,259 in back rental payments had accumulated since 1966.↩
3. SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly Worthless Debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * *
(b) Amount of Deduction.--For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.↩